Kathleen M. Dickson
Lara E. Dickson
Diane M. Dickson
David D. Dickson, et al,
And on behalf of all Families and
Children of the State of Connecticut

COMPLAINT

CA 05 328T

In the cause of a class action:

v. STATE OF CONNECTICUT

US DISTRICT COURT
1 Exchange Terrace
Providence, Rhode Island 02903

27 JULY 2005

AFFIDAVIT

**I, Kathleen M. Dickson, representing residents of the State of Connecticut, claim the following abuses and neglect of duty by employees of the State of Connecticut:**

**Civil and human rights abuses, color of law violations, deprivation of rights, and conspiracy to deprive of rights, and regarding the well-known and numerous acts and examples of incompetence, perjury, acts of defrauding the courts, state employees defrauding the police, the police defrauding the courts, judicial misconduct, the State of Connecticut's defrauding The United States of America, the criminal behavior of the Department of Children and Families (DCF) and related staff, and DCF's well-documented abuse and neglect of children and families, and in default of the protections guaranteed by federal and state laws,**

**DO HEARBY SWEAR that the following statements are truthful, sworn testimony, written as any reasonable person would understand, before God, as stated.**

<u>Statutes and Rules Violated</u>
18 U.S.C. Section 241 Conspiracy Against Rights
18 U.S.C Section 242 Deprivation of Rights Under Color of Law
18 U.S.C. Section 245 Federally Protected Activities
Americans With Disabilities Act
Risk of Injury to Minor Children
Racketeering Influenced and Corrupt Organizatrions (RICO) violations

Plaintiff KM Dickson requests of the District of Rhode Island federal court to be fully respectful of the abundantly common public knowledge of the loss of the public trust due to the indictments and criminal racketeering behavior of the former - and now criminal- Governor John G. Rowland and his staff as regards the Connecticut Department of Children and Families (DCF), and the fact that DCF in January 2004 was criticized by the Hartford Courant as

***"For a while, it seemed as if the Department of Children and Families belonged to the scandal of the week club".***

**Plaintiff KM Dickson respectfully asks the court to consider and agree that the following is true and documented, except where specified in the document to have not been delivered previously to the State of CT in the specified datapackage (one known case):**

**ROWLAND RACKETEERING**

1) The families of the State of Connecticut were victimized by the corrupt and abusive practices of the CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES and their former Commissioner KRISTINE RAGAGLIA, the former Governor JOHN G. ROWLAND, his chief of staff PETER ELLEF, his co-chief of staff LAWRENCE ALIBOZEK. These individuals were criminally charged and/or prosecuted and/or sued, with WILLIAM TOMASSO in the past year. The charges and civil allegations were theft of honest services of the government and racketeering. This was described as depriving the public of the honest services of the government, and Governor … ***"Rell said, 'Anyone who violated the public trust must be prosecuted to the fullest extent of the law.'"*** **[Exhibits A, B, C, D]**

**CT OFFICE OF POLICY AND MANAGEMENT'S INVOLVEMENT IN THE ROWLANDGATE SCANDAL:**

2) The former Manager of the Office of Policy and Management, MARC S. RYAN apparently left the state unscathed in the criminal and civil actions of the above named individuals. The CONNECTICUT JUVENILE TRAINING SCHOOL (CJTS) built by the TOMASSO Brothers is a CT State disgrace, as was the abuse of the pediatric prisoners by the guards. Governor Rell ordered DCF's current commissioner to come up with a plan for what to do with CJTS by July 1, 2005, to include closing it.

RYAN having been complicit in the misapplication of his duties to soundly provide for the residents from the federal funding, under the demands of his duties as specified above, was not punished.

**ABUSE OF CHILDREN PRISONERS:**

3) The children were abused in this prison. Attorney General RICHARD BLUMENTHAL's and the CHILD ADVOCATE'S (Jeane Milstein) Press Release states: *"The manhandling and mistreatment of children shown in these videos demands swift, strong steps to reform and revamp this facility."* **[Exhibit D]**.

One may conclude that children are abused in DCF's "care."

**<u>THE DCF – ROWLANDGATE BILLS:</u>**

4) JOHN G. ROWLAND sponsored the bills HB- 5021 (1998) and HB-6999 which stated *"The proposed increases in spending are attributed to higher than expected spending requirements in federal entitlement programs (Medicaid and Temporary Family Assistance), lower than budgeted savings from the Early Retirement Incentive Plan, the carryover effect of current years deficiencies and the Governor's new initiatives…."*

And
***"An additional growth factor is the increase of termination of parental rights petition approved by the courts, which leads to a child being defined as "no-nexus."*** **[Exhibit E]**

One might conclude that since the Rowland is in jail for his facilitating this abuse of funding and did not provide adequately for the children of the State of Connecticut.

**<u>CT DCF DEFRAUDING THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES' AGENCY FOR CHILDREN AND FAMILIES:</u>**

5) In "**CAREENING TOWARDS CRISIS,**" The Connecticut Voices for Children have determined that the State DCF "misallocated" the UNITED STATES' Department of Health and Human Services Agency for Children and Families' Temporary Aid to Needy Families (TANF funds), which were intended to go to needy families, but were instead delivered to the salaries of State DCF employees. **[EXHIBIT F]**

Among their findings:

> *"Connecticut's budget now invests far too little in the home and community-based services that can prevent child abuse and neglect in the first place…*

*... an increasing share of funds being spent on more costly and restrictive institutional and restrictive institutional out of home care.*

*DIVERSION OF TANF BLOCK GRANT funds to fund DCF staff...*
*DIVERSION of Title IV-B funds to fund DCF staff... "*

This report reads like an indictment of DCF in defrauding the federal government and the residents of CT of the DHHS' Agency for Children and Families' Temporary Aid to Needy Families it received. From page 2 of this indictment:

***"KEY FINDINGS***

***1. Growth in DCF's Budget Has Far Exceeded Growth in DCF's caseload***

*In the last decade, the number of children served by DCF increased from 7,500 children at the end of FY 94 10 12,247 children at the end of FY 04 (a 63% increase). DCF's General Fund budget grew faster-from $227.6 million in FY 94 to 606.1 million in FY 04 (a 165% increase), With DCF's revised SFY 05 General Fund budget at $642.6 million, there has been a 182% nominal increase since FY 94. While some of this growth is attributed to the more complex clinical needs of children now in care and to long overdue investments to improve the quality of care of these children, much growth is also due to skewed spending policies that skimp funding for services that could reduce child welfare involvement while, at the same time, increasing spending for "back end" placements and services."*

**"ROWLAND's NUMBERS"**

6) The former Governor JOHN G. ROWLAND made this claim on his website:

*"To help protect children, Governor Rowland has hired more social workers, moved more staff into the field to work directly with at-risk children, and made it easier to remove at-risk children from abusive homes. The number of children in new permanent homes has jumped 445 % since 1996, while the number of children found to have been abused or neglected has fallen 45 % since 1997."*

Plaintiff(s) personally find this to appear to show that 10 times as many children were taken from their parents as needed to be. If 1000% of children were taken, then there would be zero children found to be abused or neglected.

Additionally, in the January 5, 2004, Hartford Courant, in "COMPLICATED MAN AT THE CENTER OF THE CORRUPTION PROBE—Peter Ellef was a big dreamer."

*"As Gov. John G. Rowland's co-chief of staff, Ellef spoke of levitating trains, hydroponics gardening,* ***building prisons in old stone quarries*** *and opening trade relations with China. His plans after state service included* ***developing a string of juvenile detention facilities across the country****, a chain of home improvement stores and a high-end garden center.*

To the casual observer, the alleged racket run out of Rowland's office involved increasing the termination of parental rights because that made the "racket" eligible for more federal funding, proportionate to the increase in "no-nexus" children needing to be housed in some facility (like a prison) or another.

**[EXHIBIT E- the bills ]**

**DETENTION VS PREVENTION, the VIOLENCE IN HARTFORD:**

7) "**VIOLENCE HIGHLIGHTS DCF's ROLE**." The Child Advocate Jeane Milstein said in an article dated the 20th of June 05 in The Hartford Courant,

*"The state DCF anticipates spending $762,00 on prevention programs targeting teens in the coming year. The amount is one-tenth of 1 percent of he agency's $762 million budget, even though prevention is one of the agency's four principal missions; the others being child protection, juvenile justice and meeting children's behavioral health needs.*

*"It's amazing that DCF has no problem spending taxpayer money to the tune of $514,000 per child, per year at the Connecticut Juvenile Training School, but it can't find the funds in its $700 million budget on prevention programs targeting teens in the to help mentor troubled youth in our communities."*
**[EXHIBIT G]**

Plaintiff KM Dickson had made the claim that JOHN G. ROWLAND was using the DCF as a "federal money farm for the Tomassos." It is now unclear who, if "TREA" was a real entity, and if TREA is an acronym for the names of the federally indicted, and that one cannot conclude the "R" stands for ROWLAND, but may stand for RAGAGLIA, since this was a limited liability corporation, and to my knowledge, MS RAGAGLIA is a lawyer. A lawyer might be necessary to set up a limited liability corporation.

**AN APPALLING COMBINATION OF ARROGANCE AND INEPTITUDE:**

8) The CT DCF was resoundingly criticized in August 2004, by JUDGE CARMEN LOPEZ for ***"an appalling combination of arrogance and ineptitude,*** " in cases where DCF workers defraud the courts, in an effort to gain custody. PAUL CHILL of UCONN Law school was quoted in the **Connecticut Law Review** as saying, ***" was appropriately intolerant of official malfeasance and abuses of power in the child protection system."*** *Chill, who has run advocacy clinics on child protection issues for 16 years, said Lopez was the first judge to* ***hold DCF accountable.*** *"* **[EXHIBIT H]**

**THE SETTLING OF THE 1989, 15 YEAR OLD CIVIL RIGHTS CLASS ACTION AGAINST DCF:**

9) **ChildrensRights.org - Juan F. case lawsuit**. (2003). *"In October, the state and the lawyers for thousands of Connecticut abused and neglected children reached an unprecedented landmark agreement after the state and its Department of Children and Families (DCF) were charged with contempt of court for failing to comply with the court orders and improve services for children.* **[EXHIBIT I]**

Subsequently, **"CASH INFUSION IS TO PROVIDE ALTERNATIVES TO STATE'S DETENTION CELLS,"** (news article) June 27, 2005, The Hartford Courant. **[EXHIBIT J]**

The 8.5 million dollar settlement *"between attorneys representing hundreds of children in juvenile detention in a federal class action lawsuit and the state agencies that manage the detention centers and children's mental health programs."*

*"The settlement also calls* ***for increased training and cooperation on the part of state social*** *workers, juvenile probation and juvenile parole officers to make sure children with serious emotional needs have detailed treatment plans so that they can get the proper services that they deserve".*

DCF was sued for civil rights violations, which took nearly 15 years to resolve, and which concluded with increased training and cooperation. Plaintiff KMDickson had made the claim directly to Assistant Attorney General James Kelly that DCF staff were "cognitively and morally challenged" on January 27, 2003, and "cognitively and morally impaired," January 28, 2003. Reading DCF's "records" give once the sense that the DCF staff and reality are two entirely different universes. Plaintiff KMDickson was an analytical chemist for Pfizer, Inc, and thus record keeping, being absolutely accurate is imperative.

Conservatively speaking, the DCF's record-keeping indicates that mild mental retardation may be a DCF employee job requirement, as is demonstrated by Plaintiff KM Dickson in her replies to complaints made to the Statewide Bar Counsel and CT Commission on Human Rights, with the evidence. For examples, science does not equal insanity, although DCF's former New Haven principal attorney, Sarah Gibson, believes it does. A DCF "worker" Lisa McArthur informed Plaintiff Dickson that her dog and grandfather died of Lyme disease. Plaintiff KM Dickson gave this "worker" a great deal of scientific information about how damaging Lyme disease is to the nervous system. Later, DCF's McArthur and her co workers wanted to know how serious was Lyme disease. Plaintiff KM Dickson suggested that if

McArthur and her coworkers can't read, perhaps they could visit the cemetery to see if McArthur's grandfather had improved.

**APPLAUSE FOR THE PROPOSED END TO DCF'S INCOMPETENCE AND ABUSES:**

10) **"FORUM ADDRESSES CHILDREN, FAMILIES,"** (news article) Hartford Courant June 28, 2005

*"The forum focused on ways current state and federal funding needs to be changed to better protect children and promote healthy families."*

***"We need a major overhaul,"*** *Sirry (the federal court monitor of the DCF) said to applause from the crowd of about 100 child welfare professionals."* **[EXHIBIT K]**

There appears to be a broad consensus that DCF is hardly successful.

**THE FAILURE OF THE MENTAL HEALTH SYSTEM:**

11) The current LT. GOVERNOR KEVIN B. SULLIVAN was commissioned to uncover the source of **"the failure of the mental health system"** and the June 9, 2005 statement on Mr. Sullivan's website says the following:

*"But make no mistake," Sullivan added, "this is just the beginning of what we need to do in order to build a more effective and more efficient system of community-based mental health care that works and is less expensive that what we are doing now. Over the next three years, we need to keep the momentum for reform that has been lost too many times in the past. I also remain deeply troubled that the Governor, who had no hesitation taxing nursing home patients in part to help maximize federal Medicaid funding for longterm care, still refuses to end Connecticut's sad distinction as the only state in the nation not to take get back more of our federal tax dollars by taking full financial advantage of major Medicaid funding. This would go a long way in helping reinvest in mental health care for children and adults."*

Recent examples of the CT "mental health system's" alleged criminal behavior:

***HOSPITAL PSYCHOLOGIST FIRED*** *(Hartford Courant)* published on June 23, 2005,

*"A veteran psychologist at a state-run psychiatric hospital for children has been fired after investigators found he downloaded pornography on his work computer.*

*Kenneth C. Thunberg, 54, of Deep River, was on paid administrative leave from the Riverview Hospital for Children and Youth while officials from the state Department of Children and Families, which runs the Middletown facility, investigated.*

*Thunberg counseled children at Riverview for 12 years. Notified of his dismissal last......."* **[EXHIBIT L]**

***Prominent Psychologist Faces Charges*** Eating Disorder Expert Inhaled Gas, Police Say
July 12, 2005, By TOM PULEO, Courant Staff Writer
*WEST HARTFORD -- A prominent psychologist who specializes in eating disorders faces criminal charges after she inhaled propellant from whipped cream cans and collapsed on a supermarket floor in May, police say.*

*Lisa G. Berzins, 49, of 9 Talcott Glen Road in Farmington, was charged in a warrant Friday with possession of a restricted substance, third-degree criminal mischief and creating a public disturbance. She was released on $500 bail for a July 21 appearance in Superior Court in Hartford.*

*"These are only allegations," said Berzins' attorney, Bob Ludgin of Hartford. "My client is innocent unless convicted. I have confidence that there will be no convictions."*

*Berzins, who has a practice listed at 91 S. Main St. in West Hartford, has lectured and written widely in the areas of eating disorders, female development, sex roles and self-esteem, according to her speaker's biography listed with the American Psychological Association.*

*Her resume includes listings as director of the eating disorders programs at the Institute of Living in Hartford, and the former Elmcrest Psychiatric Institute in Portland. It was unclear when she held those positions."* **[EXHIBIT M]**

----

*Mumbo-Jumbo Syndrome.*

*"Munchausen's syndrome by proxy is a quintessential example of that most suspect of scientific theories — one that brooks no rational argument, a closed circle we all must accept at face value.*

*For example, the only cure must begin by the sufferer accepting that he or she is afflicted with the condition — which, of course, the alleged sufferer is loath to do. But if someone who is diagnosed as a sufferer vociferously denies it, this serves to reinforce the diagnosis. A denial of the condition is, perforce, a symptom of the condition. And then there's this: there is no cure but it is accepted that sufferers can sometimes continue to live among other people without exhibiting the symptoms — murdering people or making them ill. Furthermore, there is no agreed biological or psychological cause.*

*So there we have it: an illness that has no cause or cure and that is diagnosed at least partly by the alleged victim's denial that he or she is so afflicted. The more the victim denies it, the more obviously the victim is afflicted. And it is an illness that may somehow exist within a person without cause or cure or indeed any manifestation of its symptoms.*

*In the medical establishment, in the law courts and in the press, why were we prepared to believe this guff for more than a quarter of a century and send people to prison as a result?" -- TIMES ONLINE, UK*

Parents who say their children have Lyme disease, are often accused of Munchausen's by proxy. It is not unusual for a psychiatrist to say that the denial of the illness, is a sign of the illness. Here, the writer

questions why we accept this medical mumbo-jumbo and circular reasoning on the basis of zero evidence, in the courts, and in the press, and in the medical establishment. **[EXHIBIT N]**

**<u>FALSE ACCUSATIONS OF TERRORISM</u>**

12) Plaintiff KM Dickson complained to the USDOJ and National Institute of Mental Health on November 11, 2003, that the DCF apparently falsely informed the Stonington, CT Schools and the Stonington, CT Police that Plaintiff KM Dickson was a terrorist, or intent on murder, and the schools then had a special terrorist drill, and ordered Plaintiff Dickson off the schools' grounds. This is a National Security risk, because this distracts police from real terrorisms targets surveillance. AAG JESSICA GAUVIN listed this communication in her second petition as evidence that Plaintiff KM Dickson was insane (Nov 11, 2003 Vigilante Justice complaint). Plaintiff KM Dickson was complaining to the USDOJ and NIMH that *DCF* was insane, which is more obviously the truth. Plaintiff Dickson testified at the FDA about how Yale's dangerous LymeRIX vaccine was not a vaccine. The vaccine came off the market a year later. DCF did not help children in this way as regards Lyme disease or as regards the dangerous LymeRIX vaccine. Instead DCF accused Plaintiff Dickson of being a terrorist. The United States Department of Justice may find this to be criminal behavior on the part of the DCF. It appears that this all started with Donald G. Dickson's false accusations that Plaintiff KM Dickson intended to drive her children into a lake. **[EXHIBIT O NIMH and "Vigilante Justice?"]**

Plaintiff KM Dickson found outer, after Nov 21, 2003, that Donald G. Dickson was the one who filed the false DCF accusation that Plaintiff KM Dickson of intending to kill Plaintiff's children from reading the Lyme disease newsgroup. **[EXHIBIT P Chuck P Adams' post]**

**<u>DCF's INCOMPETENCE AND THE RHODE ISLAND TICK BORNE DISEASES MANAGEMENT PLAN</u>**

13) Plaintiff KM Dickson submitted testimony to the April 2002 Rhode Island Tick Borne Diseases Commission regarding the fraud of Lyme disease, with substantiating documentation, entitled " The

Rhode Island Tick Borne Diseases Management Plan." Rhode Island passed legislation protecting physicians from the Organized Crime and Racketeering-Influenced Corruption as regards Lyme Disease, CT DCF staff Maureen Auger asserted that since Plaintiff KM Dickson was the author of this document **[EXHIBIT Q],** it was meaningless. These are largely summaries of abstracts published in the scientific literature. If these scientific articles are meaningless, DCF's Maureen Auger should take up her claim that this science is meaningless with the National Library of Medicine, the publishers of these journals and the scientists who produced these reports.

Instead of the Plaintiff KM Dickson's Tick Borne Diseases Management Plan being adopted by the State of Rhode Island, it was adopted by commercial interests in Rhode Island. This is evidence of DCF's incompetence.

**FALSE DCF ACCUSATIONS MISHANDLED**

14) The psychiatrist-diagnosed (diagnosed by J. David Ruffner, MD, Psychiatrist) "sociopath," Donald G. Dickson, falsely claimed to the DCF that Plaintiff KM Dickson was going to drive her children into a lake. Nancy E. Martin, 21 Redstone Way, Farmington, CT made numerous false allegations to DCF, and was not arrested at the depositions, where these allegations were discovered to be false. Nancy Martin proceeded to lie under oath, however, and give a vague explanation of Plaintiff KM Dickson's having been talking about her grandparents, as if they were alive during Plaintiff Dickson's brother's funeral in 1977. In fact, they all were dead for 12 years by 1977, and no such bizarre conversation happened. Nancy E. Martin, and Donald G. Dickson further perjured themselves at Plaintiff KM Dickson's DCF "trial." Every single statement made by the DCF's witness at Plaintiff Dickson's "trial" was perjury, with the exception of James Phillips saying Plaintiff Dickson was a victim of child abuse. That abuser was Carolyn Martin, who, we found out at the depositions, invented *herself,* that Plaintiff KM Dickson said she would "slit her own throat," an accusation which made its way into the DCF's first petition, which was thrown out, and but was retained as part of a final statement DCF made for the court, December 23, 2004. Carolyn Martin was also not arrested by DCF for making false allegations.

The "sociopath" Donald G. Dickson made other false allegations to the DCF at least twice, and once told the DCF falsely that Plaintiff KM Dickson "beats the children's butts until they are red," "pokes them in the face with sticks," and "screams at them non-stop for two hours." Plaintiff KM Dickson is sick with the Multiple Sclerosis presentation of Lyme Disease. If Plaintiff KM Dickson could scream for 2 hours, she would not be disabled from Lyme Disease.

**DCF's DELIBRATE RISK OF INJURY TO MINORS**

15) Plaintiff Dickson faxed DCF's Lisa McArthur on January 6, 2003, the extensive evidence of Donald G. Dickson's abuse history, including his arrest for domestic violence (1993), a restraining granted order against Donald G. Dickson (1996), and a letter from the Battered Women's Shelter in New London, CT (1994), stating that Plaintiff KM Dickson and her 2 older children had to stay there temporarily for safety from Donald G. Dickson. **[EXHIBIT EE** The alleged "harassing communications and threatening"] This should have been enough evidence that Donald G. Dickson was not a reliable witness. Instead, DCF gave the Plaintiff KM Dickson's children to this well-known child abuser (taken in testimony by DCF of the children themselves) and wife beater, Donald G. Dickson, which is illegal. This is risk of injury to a minor:

*"Anyone who exposes a child to harm or fails to protect a child from physical assault may be prosecuted under the risk of injury statute." Hartford Courant, July26, 2005*

DCF informed Plaintiff KM Dickson's children that if they complained about being placed with an abusive parent, they would be kidnapped again and placed in separate foster homes, therefore this dangerous placement was deliberate.

The CT statute regarding false allegations to DCF stipulates a $1500 fine and up to a year in prison, yet when Plaintiff KM Dickson tried to discover how to prosecute false allegations, the Middletown Superior

Court, and the Milford State's Attorney's office did not know whose job it was to prosecute false allegations, because, as they told Plaintiff Dickson, no one had ever been prosecuted for false allegations before. Thus, DCF are incompetent to an apparently unlimited number of their own statutes.

**"CONFIDENTIALITY" AND "IMMUNITY"**

16) "Judge" John C. Driscoll stated that the "proceedings" of a DCF "trial" are confidential, however, DCF's former New Haven principal attorney, Sarah Gibson sent Plaintiff KM Dickson a copy of Connecticut Statute 17a-28, which clearly states that the "person" who is a defendant, and who is guilty regardless of being proven innocent, may give any information about their DCF "case" to whoever they want. Plaintiff KM Dickson, as a long time human rights activist, exposed the fraudulent and bizarre activities of CT DCF to the entire world, so that other families may be warned and protected against their abuse, by scanning in evidence into her website and posting to various newsgroups, the truth about DCF's behaviors and incompetence.

The only reason these DCF proceedings are kept "confidential," is to protect from criminal liability, the perjury of the DCF, their deliberate defrauding of the courts, and the perjury they orchestrate with their witnesses under their "immunity." That the average legislator can't see the reasoning behind these combined conditions, "confidentiality" and "immunity," especially in the face of the rising budget and 445% increase in children taken from their parents in contrast to a 45% reduction in child abuse, and especially when it is well known that the mental health system is a failure, speaks to legislators' either motives or incompetence. The statute clearly states that the defendant/perp may release records to anyone they want, canceling out any confidentiality rulings.

The CT DCF and their inane statutes are clearly organized crime and racketeering influenced, due to the obvious intimidation attempts to commit and attempts to falsely arrest people who complain to the proper authorities about the criminal behavior of the CT DCF staff.

**RECENT NEWS REGARDING CT DCF's CARE OF PEDIATRIC PRISONERS:**

17) CT DCF is in charge of the juvenile justice system in CT. In today's (July 27, 2005) Hartford Courant, it was claimed that:

***"And some say that when 16- and 17-year-olds are added in, Connecticut has the nation's highest incarceration rate for youths."*** This news article comes on the heals of yet another child who killed himself in DCF's "care," this past Sunday, July 24, 2005. The child hung himself in one of the DCF's prisons for children. It never ends. DCF shows no signs of willingly ending their practices of harming children, will not do so voluntarily, and retaliate against people who claim abuse by DCF and ask for relief and fairness.

**"ROWLANDGATE" AND NATIONAL SECURITY:**

18) This extraordinary number of children removed from parents, jailed, and mistreated by DCF may have something to do with John G. Rowland describing himself as "a National Security Advisor" to President George W. Bush. The criminal enterprise run out of Rowland's office, TREA, was about a "national string of prisons and juvenile detention centers." Some people have claimed that this Bush administration plans to incarcerate people who protest against the NeoCon abuses masterminded by Paul Wolfowitz:

*"Project for a New American Century*

*Wolfowitz however could not remain completely out of politics for long and in 1997 he became one of the charter members, alongside Donald Rumsfield, Dick Cheney, Jeb Bush, Richard Perle and others, of the Project for a New American Century (PNAC). William Kristol and Robert Kagan founded this neo-conservative think-tank with the stated aim of "American global leadership" through military strength. In 1998 Wolfowitz was one of the signatories of the PNAC open letter to President Bill Clinton that was highly critical of his continued policy of containing Iraq. The PNAC advocated preemptive U.S. military intervention against Iraq and other "potential aggressor states" to "protect our vital interests in the Gulf". In 2000 the PNAC produced its magnum opus the 90-page report on Rebuilding America's Defenses: Strategies, Forces and*

*<u>Resources for a New Century</u> that advocated the redeployment of U.S. troops in permanent bases in strategic locations throughout the world where they can be ready to act to protect U.S. interests abroad. The Clinton administration however remained unmoved and pressed on with containment.=== wikipedia*

Pre-emptive military aggression, when it is clearly about oil and not national security, may result in a national security risk to Americans. Americans might not stand for the increased terrorism, in retaliation for a fraudulent Iraq war, directed at Americans, and Americans might also rebel against this "administration," or the concept of the United States becoming the self-designated World Police. Such a rebellion could be accommodated by a national string of prisons and juvenile detention centers. America has little GNP or natural energy supplies of our own, and in such an economically disadvantaged state it appears that the US has little choice but to become a world police force. Perhaps the plan is to pay ourselves by taxing other countries for this unwanted service. Paul Wolfowitz is now the head of the World Bank. Bush's 2005 Inaugural speech contained these passages:

*"A few Americans have accepted the hardest duties in this cause - in the quiet work of intelligence and diplomacy ... the idealistic work of helping raise up free governments ... the dangerous and necessary work of fighting our enemies. Some have shown their devotion to our country in deaths that honored their whole lives - and we will always honor their names and their sacrifice.*

*All Americans have witnessed this idealism, and some for the first time. I ask our youngest citizens to believe the evidence of your eyes. You have seen duty and allegiance in the determined faces of our soldiers. You have seen that life is fragile, and evil is real, and courage triumphs. Make the choice to serve in a cause larger than your wants, larger than yourself - and in your days you will add not just to the wealth of our country, but to its character."* **[EXHIBIT R]**

## <u>DANGEROUS PERJURY- DMHAS</u>

19) DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES' (DMHAS) "Medical Director," Kenneth Marcus, [see EXHIBIT X for more background info on "Dr." Marcus] came to Plaintiff Dickson's DCF "trial," perjuring himself in court and said you treat an organic delirium like any

other psychosis, when that is clearly against the American Psychiatric Associations (APA) Guidelines, due to the increased brain damage caused by this mistreatment **[EXHIBIT T ].**

The APA guidelines clearly state, "*When delirium is comorbid with other psychiatric disorders, the delirium should be treated first.* " This is a guideline that should apply to all persons with neurologic Lyme disease. Central nervous system Lyme disease should be treated with ceftriaxone. The guideline continues:

*"Medications for psychiatric disorders can be both the cause of delirium and exacerbate or contribute to delirium from other causes."*

Lyme disease is an organic brain syndrome. **[EXHIBIT U]** As published by Allen Steere in 1989, *"Lyme disease may affect the central nervous system causing organic brain syndromes suggestive of demyelination."*

In an world uncomplicated by the perversion of dogma regarding the source of emotional trauma, wherein sexual repression is considered to be the cause of child abuse emotional sequelae, instead of child abuse being the cause of child abuse sequelae, as is the case of the perverted world of James Phillips, MD, Clinical Professor or Psychiatry at Yale and Forensic Psychiatrist for the State of Connecticut, a mere reading of the scientific documentation given to James Phillips, MD, regarding the science of Lyme as a brain disease, by Plaintiff KM Dickson, would have alleviated the steps where the Plaintiff KM Dickson's children were traumatically removed by DCF, and Plaintiff KM Dickson went to jail, in the end, for Carolyn Martin's child abuse. We could have moved on to guaranteeing proper medical treatment for Plaintiff KM Dickson and her children, and a validation of this neuropsychiatric disease, borreliosis. Freud is out of style. Freud invented, in fact, his psychotic assertions that the world's woes are due to inadequate sex instead of inadequate care or love, because the fathers of Freud's female "hysteria" patients, were in fact, the sexual perpetrators against these female children, who later grew up to be Freud's "hysterical" patients. The fathers did not approve of Freud's discoveries. Modern Psychiatry, thanks to the bad fathers of Freud's day, was then founded upon the concept that the victim is the guilty, or the victim is the "bad" one. Little has changed.

DMHAS' Kenneth Marcus also said for the DCF "court," something to the effect that Plaintiff KM Dickson "is so psychotic, she does not know how psychotic she is, which is a sure sign of her psychosis." Plaintiff had left numerous scientific journal articles in the office of Laura Lustig, PhD, of The New Learning Center, Westport, CT, which demonstrated the cellular brain damage and other damage caused by most psychotropics. These were also on Plaintiff KM Dickson's website, ActionLyme.com. This is not only perjury and promoting malpractice, but more psychiatric Mumbo Jumbo. With this reasoning, Plaintiff KM Dickson could make the claim that "DCF and DMHAS staff are so stupid, they don't know how stupid they are, which is a sure sign of their stupidity."

More seriously, it calls into question the validity of any psychiatric expert testimony in any legal case, since this was clearly an attempt by DCF to commit Plaintiff KM Dickson, in an attempt to falsify more records, and preventing Plaintiff from filing malpractice lawsuits and other complaints about the criminal behavior of the DCF, as regards Yale's dangerous Lyme vaccine, and as regards the Yale/Allen Steere-orchestrated apparent conspiracy to create a fraudulent testing schema for Lyme disease to pass off their bogus Lyme vaccine, LymeRIX, and to also guarantee a monopoly on the post-FDA approval of Yale's LymeRIX vaccine.

This perjury, on the part of DMHAS' Medical Director, is a severe and dangerous color of law abuse, and should result, minimally, in Kenneth Marcus' immediate resignation. **[EXHIBIT V- 3:05-CV-91 (CFD)]**

Yale and DMHAS's Vladimir Coric fraudulently reported to the criminal court numerous aspects of Plaintiff Dickson's mental health. The Plaintiff's children's Ad Litem, Priscilla Hammond (Old Lyme CT), walked up to Plaintiff Dickson November 21, 2003, after the DCF depositions, in Milford, CT, and said, "The State is watching this case very closely."

Therefore, it is not paranoid of Plaintiff Dickson to be saying, "The State is watching this case very closely." Coric also perjured himself and stated that Plaintiff Dickson was treated with antipsychotic

medication for 5 years when she was in her twenties. Plaintiff Dickson had stated to Coric, that she was given exactly and only 3 bottles of tranquilizers to be used as needed, *over a 5 year period*, and in truthfulness, and to indicate that there was little medication involved in Plaintiff KM Dickson's previous psychiatric history of depression due to the child abuse by Carolyn Martin, Plaintiff's "mother."

Carolyn Martin is now responsible for destroying the lives of exactly 9 children: five of her own, and four grandchildren, due to her abundant and bizarre lying, hatefulness, and chronic- and lifelong- extreme physical violence to children, which included beatings with a cat of nine tails (whip), beatings with this whip with and without clothing, and full force kicks upon children. That Carolyn Martin is free to harm more children is a testament to the failure of the "mental health system," the "child protection system," and the "criminal justice system" in Connecticut. **[EXHIBIT W, Carolyn Martin is known by all to be a crazy person.]**

**REGARDING THE DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES AND THEIR RELATIONSHIP WITH THE DEPARTMENT OF CHILDREN AND FAMILIES:**

20) DMHAS is incompetent to brain matters as described in a lawsuit against the State of CT and Yale University. The State of Connecticut cannot handle important epidemics such as autism and Lyme borreliosis as disclosed in 3:05 –CV- 91 (CFD). **[EXHIBIT V]**

DCF hired Laura Lustig of the New Learning Center, Westport, who declared for the court, that Plaintiff KM Dickson has Borderline Personality Disorder and Autism, when the two disorders are mutually exclusive. Autism is defined by a lack of a personality. Plaintiff KM Dickson was diagnosed with High Functioning Autism and has two blood relatives with the same cognitive strengths and deficits. This is medical and legal incompetence. Yale University has a Center for the Study of Autism. Yale University also rediscovered Lyme as a brain infection, yet no Yale or DMHAS physician is competent to either disorder that Plaintiff KM Dickson has encountered.

The CT 54-56D competency statute assumes that DMHAS is up to date on brain matters. Clearly for the entire combined National Institutes to declare Chronic Lyme to be a chronic infection of the nervous system, and for Yale and DMHAS to declare otherwise, places DMHAS and Yale staff in default of the competency required by the CT 54-56D competency statute.

## FALSE CRIMINAL CHARGES, CONSPIRACY AGAINST RIGHTS, FEDERALLY PROTECTED ACTIVITIES

21) Plaintiff KM Dickson was falsely criminally charged with the bizarre perjury invented by DCF prosecutor Assistant Attorney General JESSICA GAUVIN. The Honorable Kevin P. Murphy ordered Plaintiff Dickson to be treated for Lyme disease, as a condition of her release. The prosecution subsequently switched courts to New Britain, CT, where the State proceeded to orchestrate more perjury, and state that Plaintiff Dickson does not have Lyme disease and that Lyme is not a brain disease (DMHAS's Elizabeth Byron) **[EXHIBIT X Scott Murphy datasets].**

Plaintiff KM Dickson does not have "command hallucinations to kill Jessica Gauvin," and Plaintiff KM Dickson is not a "dangerously intelligent" "chemist" "like Ted Kaszinski," the Unibomber. This is the nonsense GAUVIN invented for Plaintiff KM Dickson at Plaintiff KM Dickson's DCF "trial," and with which GAUVIN then later falsely criminally charged Plaintiff Dickson.

Plaintiff KM Dickson is a human rights activist, Lyme support group leader, and testified at the FDA about Yale's dangerous LymeRIX vaccine as a pharmaceutical chemist, demonstrating for the FDA (January 31, 2001) that LymeRIX was not qualified with a proper standard and should not be used for children until we know what is making adults so sick from this vaccine. These are, to Plaintiff KM Dickson's knowledge, not the Unibomber's methods of activism.

The epidemic of Lyme disease, which is "Connecticut's disease," has made no progress in treatment, detection, or prevention in the past 19 years. The CONNECTICUT STATE DEPARTMENT OF

HEALTH, the STATE DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES, the STATE DEPARTMENT OF CHILDREN AND FAMILIES have all failed their commissions including the CT state competency statute, 54-56D, for not addressing this epidemic and not recognizing that borreliosis is a primarily a brain and nervous system disease.

In fact, despite being given the published scientific evidence which clearly demonstrates that Lyme borreliosis is a brain disease, DMHAS staff, in court, in deliberate perjury, and despite the entire combined National Institutes' declaring that Lyme is a borreliosis- a permanent brain infection (The NIH's Integrative Neural Immune Program), and despite having full knowledge that Lyme is a brain disease (since these rediscoveries were also made at Yale University), stated for the court that Lyme is not a brain disease and that DMHAS was not aware of Plaintiff Dickson's diagnosis of Lyme disease.

DMHAS staff further perjured themselves and stated that Plaintiff KM Dickson refused to meet with a neurologist. Plaintiff met with Christopher Gottschalk, later discovered to be a Yale Neurologist, who told Plaintiff that Lyme is not a permanent brain infection, which is false. Gottschalk told Plaintiff KM Dickson he was from Cross County Neurology Group and gave Plaintiff the document which is **EXHIBIT Y.**

**<u>FAILURE OF COMMISSIONS:</u>**

22) The commissioner of the DEPARTMENT OF SOCIAL SERVICES is obligated to: *16) conduct, encourage and maintain research and studies relating to social services development; (17) prepare, review and encourage model comprehensive social service programs; (18) maintain an inventory of data and information and act as a clearing house and referral agency for information on state and federal programs and services; and (19) conduct, encourage and maintain research and studies and advise municipal officials and officials of social service agencies about forms of intergovernmental cooperation and coordination between public and private agencies designed to advance social service programs.* (see definitions and statutes at end of this document).

DCF was given hundreds of pages of documents related to Lyme disease and Autism, by Plaintiff KM Dickson, from December 2002, to March 2003. Plaintiff Dickson received her DCF "records," in March, 2003, more than three months after requesting them, and only with the assistance of Congressman Rob

Simmons. When Plaintiff KM Dickson read these records, she was assured she was dealing with extremely mentally defective individuals employed by the State of Connecticut, and began filing complaints with various agencies of the State and Federal government about CT DCF. DCF later removed Plaintiff's children, in November 2003, defrauding the DCF "court" in their Temporary Order of Custody. These are color of law, deprivation of rights, and violations against federally protected activities. Residents may file complaints with the proper authorities, under these Federal Civil Rights Statutes (USC Title 18, Secs 241, 242, 245). DCF is clearly funded by federal agencies (DHHS, Agency for Children and Families, etc.), and the latter statute specifically protects individuals from color of abuses by federally funded organizations.

DCF's former Commissioner Kristine Ragaglia resigned from DCF some time in Feb or March, 2003, but was later re-employed by the Department of Social Services some time after March 2003. Plaintiff KM Dickson gave (emailed and hand-delivered) Ragaglia and others employed by DCF these scientific documents which supported that Lyme is a borreliosis- a permanent infection of the brain, that "Lyme disease" is not a controversy, but scientific fraud, that autism is a pervasive development disorder, and the scientific evidence of the brain damage caused by all psychotropics. This scientific evidence was also on Plaintiff KM Dickson's website, ActionLyme.com.

DCF, DSS, DPH, and DMHAS are in default of their basic commissions, which are to know facts, serve and provide, based on the facts, the science, and the state of the art, in care. They are not commissioned to become a participants in the scientific fraud of Lyme disease.

**FAILURE TO ACT IN THE INTERESTS OF THE STATE BY ATTORNEY GENERAL RICHARD BLUMENTHAL:**

23) AG RICHARD BLUMENTHAL was mailed an enormous amount of information regarding the fraud of Lyme disease by Plaintiff KM Dickson. R. Blumenthal held two public hearings on the mistreatment of persons who have Lyme disease by insurance companies and Yale University (1999 and 2004). Richard Blumenthal did not act to protect the residents of the State of CT even when given

evidence of the perjury which occurred at one of his hearings, and as regards the NIH Edward McSweegan and Yale's Durland Fish's conspiracy to send Karen Forschner of the Lyme Disease Foundation in Hartford, CT, "a bogus article" to publish in their journal, The Journal of Spirochetal and Tick Borne Diseases (JSTD). Yale University is involved in the scientific fraud of Lyme Disease.

Richard Blumenthal's staff lawyers referred Plaintiff KM Dickson to the US Attorney Kevin O'Connor as the person with whom to file the complaint of scientific fraud as regards Lyme disease (RICO) in July 2003. Kevin O'Connor's wife worked in Rowland's legal office and Mr. O'Connor had to recuse himself from the investigation of the criminal former Governor Rowland and the activities which were conducted from Rowland's office which involved the DCF's Kristine Ragaglia and others defrauding the federal government.

These communications to Richard Blumenthal regarding the Lyme racketeering enterprise were instead used by AAG JESSICA GAUVIN to be evidence of Plaintiff KM Dickson's insanity. DMHAS's Kenneth Marcus testified at Plaintiff KM Dickson's DCF "trial," "Don't look at the content...," of these communications.

Plaintiff KM Dickson is a scientist. Content is of primary importance in any scientific report. The content specified in these reports regarding the scientific fraud in "Lyme Disease" are why Plaintiff KM Dickson cannot get medical and special education care for herself and her 3 children, who have Lyme disease. The "content" demonstrated the scientific fraud in Lyme disease, and how that involved Yale's dangerous Lyme vaccine.

Plaintiff KM Dickson asserts that it might be either perjury or psychiatric mumbo jumbo to be saying that because the State of CT failed to protect its citizens from the deliberate in the denial of care for Lyme disease, and for Yale's attempting to pass off a bogus Lyme vaccine (for which adverse events were not

reported to the FDA), that the Plaintiff KM Dickson is insane to be reaching to the federal level for protection.

**SUMMARY OF THE STATE OF CONNECTICUTS FAILURES TO PROMOTE AND PROTECT THE GENERAL WELFARE:**

Lyme disease is an epidemic of a brain infection, and there is a rising epidemic of autism, yet neither of these two illnesses are addressed even lightly by any of the Departments of the State of Connecticut, with the possible exception of the DEPARTMENT OF MENTAL RETARDATION (DMR) as regards autism. The State hires experts who are completely unfamiliar with autism as a "pervasive development disorder" or Lyme as a brain disease, despite these experts being associated with the Yale Department of Psychiatry (VLADIMIR CORIC), which has an autism clinic, and despite a report by the Yale Department of Pathology in which the congenital brain damage from Lyme infection was listed as the probable cause of death in one newborn and one stillborn infant. **[EXHIBIT X - Scott Murphy dataset, June 11, 2005]**

Clearly the DMR needs to be explaining what a pervasive development disorder is to the DCF, Yale Department of Psychiatry, and DMHAS.

It is inherently within the commissions of the DCF, DPH, and DMHAS to have an understanding of, and address the needs of the disabled with Lyme and/or Autism. Thus, they have failed their basic commissions.

The OPM is authorized to discover federal aid sources, however, MARC S. RYAN appears to have dominantly sought increased the spending for the DCF in House Bills 1999 5021 and HB 2001, 6999 and as is written into the text, this increase in state spending was required to meet increased federal spending requirements, and RAGAGLIA appears to have added, ***"due to the increase in termination of parental rights being approved by the courts…"*** This is inconsistent with providing aid to needy families, and

which may be another deliberate fraud against the United States of America, the Connecticut public, and the federal government, and which resulted in a 445% increase in children taken from their parents and the disgrace of the pediatric jail. **[EXHIBIT Z Letter to Rell, DMHAS's perjury dataset, July 1, 2005]**

DCF prosecutors willfully and knowingly falsely criminally charge parents with the false allegations, hearsay, and the perjurous testimony elicited and invented by the DCF prosecutors themselves and their "witnesses," and then deny the parents access to the courts by declaring the parent insane to say they are innocent and threaten their victims with being involuntarily committed if they maintain their innocence. **[EXHIBIT X (eg., Scott Murphy dataset re: Christopher Gottschalk, Joseph More, Sam Donta, Lara, Diane and David D.)]**

There is clearly a consistent pattern of criminally charging parents with whatever is today's flavor of inane crime if the parent/alleged "perpetrator" retaliates against the criminal behavior of the State of CT employees by filing the proper documents for relief from abuse and neglect with the proper agencies.

DCF willingly and knowingly places children in dangerous homes, and informs the children that if they complain of this abuse, they will be placed in separate foster homes. DCF willingly and knowingly fraudulently declares parents to be mentally ill to be filing legitimate complaints about judges, DCF attorneys, and DCF staff to the Commission on Human Rights and Statewide Bar Counsel, and Judicial Review Boards, in order for the claim to be considered invalid. These are Color of Law abuses, Conspiracy Against Rights, and violations of the rights to Federally Protected Activities.

DCF threatens the liberties of parents, and makes it a condition of release that the innocent parent admit guilt for the crimes they did not commit, and that the parent may not "criticize the government," nor "fax any state, federal, or local agencies," which are clearly and abundantly civil and human rights abuses,

illegal, a violation of the First Amendment, a violation of the Americans With Disabilities Act, violations of Federally Protected Activities, Conspiracy to Deprive of Rights, and Color of Law abuses, when the parent has Lyme disease, and especially when the children also have Lyme disease and can get no access to care. **[EXHIBIT Z]**

It is criminal child abuse to willfully deny children access to medical care, when the denial of medical care results in a regression of health, yet the State of Connecticut does this consistently as regards all Lyme disease victims, including children.

These behaviors and actions of CT DCF staff are Title 18 Secs 241, 242, and 245 criminal civil rights violations (Title 42, Sec 1983, redundant).

------

**<u>THE CHIEF STATE"S ATTORNEY CHRISTOPHER MORANO AND THE PUBLIC DEFENDER'S OFFICE ON COMPENSATING COURT APPOINTED LAWYERS FOR CHILDREN AND FAMILIES HARASSED BY DCF:</u>**

24) In default of proper protections provided by the State to families involved with DCF in comparison to criminal cases, as stated publicly by Chief State's Attorney, Christopher Morano, and the Public Defender's office regarding court appointed attorneys, parents who are victims of DCF's abuses, in the interest of the welfare of children and families, should expected to take humane and compassionate action on behalf of other families who will be destroyed by the Connecticut Department of Children and Families, without such public exposure and restraint as otherwise afforded under the US Constitution, but denied all Connecticut residents. These incidents reveal gross incompetence, and criminal civil rights violations, not only on the part of DCF staff, but also the police. Lawyers assigned to children victimized DCF attack are paid a fraction of fees for court appointed representation of criminal charges. These lawyers for children have since passed legislation protecting themselves from malpractice lawsuits by families who they inadequately represented. **[EXHIBIT AA]**

There is no legislative protection for the families against this inherent, built-in, legal incompetence.

**25) OTHER CASES OF THE STATE'S INCOMPETENCE, RETALIATION, ABUSE, QUESTIONS OF INTEGRITY**

25- A) Daniel Scruggs: In the case of the suicide of Daniel Scruggs, the entire family was in need of services, and had been visited by DCF. A simple $40 weekly contract with a cleaning service, in light of the cognitive disabilities of Mrs. Scruggs and her son Daniel, provided under the Temporary Aid for Needy Families, would have been a logical remedy. Daniel Scruggs was depressed and was said to be mildly autistic (newspaper article), yet no one, and in particular, no one at DMHAS or Yale is competent to Autism/Asperger's in adults. One can assume Daniel Scruggs inherited his cognitive disabilities from either his mother or his father (who was notably absent), yet the father shared no liability for this tragedy.

**[EXHIBIT BB]**

It appears that ***"Scruggs' arrest by Meriden police came six weeks after Norris filed the notice of intent to sue the city of Meriden for failing to protect Daniel from daily bullying."***—not included but taken from Hartford Advocate, November 2003, "Everyone was at Fault" news article.

Charging Mrs. Scruggs appears to be retaliation by the State, and an effort to prevent legal discovery of DCF's incompetence and liability in the death of this child. This appears to be another case of a conspiracy to deprive of rights.

25- B) Baby Emily: In the case of Baby Emily, recently resolved by the State of CT, *"A state investigation after Emily's death found that* ***state child welfare workers knew of abuse within the infant's family and failed to protect children*** *in the household."* **[EXHIBIT CC]**

This is a simple evidence point of DCF's abundant incompetence.

25- C) Jennifer O'Connor: Mrs. O'Connor informed Plaintiff KM Dickson that she had asked the DCF to come and give her parenting skills in regards to herself and her daughter Sara. Approximately April

2003. DCF came to visit Mrs. O'Connor, found "no abuse or neglect," and declined the request for assistance. A few weeks later, Mrs. O'Connor shot and killed her daughter, presumably as a result of her deficit in parenting skills, which was not addressed by DCF despite the specific request. Plaintiff KM Dickson feel this behavior on the part of the DCF is consistent with the DCF staff not understanding big words like "Neuroborreliosis," which the DCF staff calls "bizarre talking," and is consistent with the acknowledgement that DCF staff needs "increased training," in the conclusion of the Juan F. case.

Mrs. O'Connor was diagnosed with a learning disability, as was her daughter, and had had genetic screening prior to becoming pregnant, Plaintiff KM Dickson was told by a friend of the family. Plaintiff KM Dickson's experience and knowledge of Autism and Asperger's disorder, leaves Plaintiff KM Dickson strongly aware that Mrs. O'Connor was misdiagnosed as "mentally ill," when she had Asperger's disorder, and may have been subject to malpractice, in addition to the incompetence of the DCF staff. This conversation took place in the jail; Plaintiff Dickson does not have access to Mrs. O'Connor's DCF records. Plaintiff Dickson's understanding from reading the news reports online, is that Mrs. O'Connor called the DCF herself for assistance. This assistance was denied. The child is dead, and Mrs. O'Connor is in jail instead of in an assisted living arrangement or with assistance for herself and her daughter's learning disabilities **[EXHIBIT DD]**

The primary problem with DCF's incompetence is never addressed: The fact is, they don't appear to understand common English. If someone says, "Help Me," it doesn't mean, "Blow me off," and it doesn't mean, "Subject my children to a traumatizing kidnapping, and give them to a known –to-DCF, chronic genitals-exposing, physically violent to others, maniac (Donald G. Dickson)," and it doesn't mean, ""If I am sick, and sometimes need DCF's babysitting Respite Care, tell the courts I am insane, kidnap my kids and give them to someone known to be a violent person, invent my crimes and throw me in jail." If DCF is not a child welfare agency, they should not advertise as such, and mislead the public. This is a waste of tax dollars, not to mention children's lives.

25- D) The "harassing communications and threatening," with which Plaintiff KM Dickson was falsely criminally charged are dated 14 April 2004, and are in correspondence with the US Attorney's office (Kevin O'Connor), and CIGNA, Plaintiff KM Dickson's Pfizer disability insurance carrier, and which contain more newspaper articles of DCF's incompetence. **[EXHIBIT EE]**

> -March 8, 2004 (Courant) "DCF never asked, DPH never told of hospital problems" Quote from Jeane Milstein (as regards DCF):
>
> ***"Common sense would tell you to pick up the phone and do your homework."***
>
> -March 7, 2004 (Courant) "Hospital Troubles Elude DCF" Jeane Milstein:
>
> *"You learn from your mistakes. You learn from what you do,' Milstein said.* ***'DCF needs to be a more responsible parent.'"***
>
> -December 18, 2003, Courant "MILSTEIN SUES DCF OVER AGENCY'S TREATMENT OF ABUSED CHILD"- Associated Press.
>
> *"Milstein accused DCF of* ***'callous and reckless indifference*** *in caring for the youth, and she suspects other children may be suffering because of DCF's missteps."*

25- E) Christopher Kennedy: In the case of Mr. Christopher Kennedy, it is Plaintiff's KM Dickson's belief and knowledge that this started out as a simple case of divorce, and ended with numerous criminal charges against a man who had no criminal history until DCF involvement. Mrs. Leanna Kennedy was arrested for second degree assault for stabbing Mr. Christopher Kennedy. On Friday, June 30, 2005, Mr. Kennedy was charged with perjury and the bail was said to be requested at $500,000 but was dropped to $50,000.00. To Plaintiff KM Dickson's understanding, Mr Kennedy was charged with perjury for neglecting to mention that there had been issued a restraining order against Mr. Kennedy. As Plaintiff KM Dickson informed CT Governor Jodi Rell via mail, that if the State were charged at a rate of $50,000 per incident of perjury in Plaintiff KM Dickson's "cases," the State would owe a debt in the range of $50,000,000.00. **[EXHIBIT FF- 1,- 2]**

Mr. Kennedy's wife has been arrested for stabbing Mr. Kennedy. Plaintiff KM Dickson is not aware of Mr. Kennedy stabbing Mrs. Kennedy, yet Mr. Kennedy is facing jail time for false criminal charges. DCF was "involved."

Although Mr. Kennedy sought redress directly with the present Governor's Chief Legal Counsel, Kevin J. Rasch, Mr. Kennedy was instead charged with perjury.

25- F) In comparison, to the above Christopher Kennedy Perjury case, MR. JOHN G. ROWLAND defrauded the federal court in his financial affidavit regarding his income, yet no charges were filed. Mr. Rowland's sentence was not compounded for nearly the same negligent "perjury" with which Mr. Kennedy is charged. **[EXHIBIT GG]**

> ***"But federal prosecutors were disappointed. On Thursday, the U.S. attorney's office had urged Dorsey to put Rowland in prison for up to 37 months, saying that the office had learned that Rowland had tried to conceal a $416,000 personal retirement account from federal officials. By portraying his financial condition as increasingly dire, prosecutors said, Rowland was trying to generate leniency from the court"— Hartford Courant March 19, 2005***

25- G) It is noteworthy that as regards Governor Rell and her son's behaviors, from *CORPORATE CRIME REPORTER* http://www.corporatecrimereporter.com/curryinterview.htm

> *"**CCR:** If he is impeached or resigns, what is the provision in Connecticut law for an emergency election?*
>
> ***CURRY:** There isn't one. It's one of the questions I've raised with people in the last few weeks. As in most states, the Lt. **Governor** takes over. I think that's a mistake. I think we designed the offices of vice president and Lt. **Governor** with an eye to the death or incapacity of the President or **Governor**.*
>
> *I believe that when a chief executive is marched out of office for impeachable offenses, we should have an election to fill the remainder of the term. The idea that a member of Rowland's posse simply follows in Rowland's footsteps is a bad one.*
>
> ***CCR:** Has the Lt. **Governor**, Jodi **Rell**, been implicated?*

> *CURRY: When her son was found by state environmental officers to be running a stolen property ring out of her basement for Skidoos, the environmental officers who made the arrests had their careers threatened.*
>
> *They suffered until it hit the press and then the administration backed off. She denied any involvement in the retaliation. Again, Connecticut's extraordinary unwillingness to investigate the apparent corruption of its own elected officials saved her from further public embarrassment.*
>
> *In any event, she has been a happy, willing partner and an insider in the Rowland administration for nine years."*

this at least gives the suggestion that the State of Connecticut is corrupt, and to include the present Governor. **[EXHIBIT HH Corporate Crime Reporter, Curry Interview]**

**25- H) The Saraceno Case:** Plaintiff KM Dickson suspects the integrity of Chief State's Attorney Christopher Morano due to what we learned in the Hartford Courant's Northeast Magazine, Jan 9, 2005, regarding the Saraceno boy's case:

> "Saraceno was convicted and imprisoned but later released after a private investigation discovered that the prosecutor was protecting four other young men who almost certainly did the crime. The chief state's attorney's office uncomfortably joined in the defense in a motion to overturn the conviction. That should have freed the youth from further jeopardy. Instead, in 1999, under threat of extending the legal nightmare that had already cost his parents $100,000, Saraceno accepted guilt for "hindering prosecution by falsely confessing. " Under the statute of limitations, the state had allowed the five-year window for prosecuting the known suspects to close. No one except the wrong man did jail time for the crime. The law officer most responsible for compelling Saraceno to declare it was his fault is Chief State's Attorney Christopher Morano".

25- I) **The Office of Public Integrity**: Mr. Christopher Morano, the Chief State's Attorney has an Office of Public Integrity, yet Morano never responded to the integrity complaints lodged by Plaintiff KM Dickson as regards the bizarre and discriminatory behavior of DCF staff.

**25- J) CHRISTOPHER MORANO'S BIRTHDAY PARTY, FROM THE WEBSITE: CRIME AND FEDERALISM, by Norm Pattis:**

*March 29, 2005 in Federal Courts | Permalink | Comments (5) | TrackBack*

***But the Governor did it?***

***Norm Pattis***

*Connecticut calls itself the Land of Steady Habits. In recent years, those habits have evolved to graft among its public officials. Why just the other day, former Governor John G. Rowland was sentenced to federal prison for a brief stretch. He couldn't keep distinct in his mind his official duties and gorging himself at the public trough.*

*After his guilty plea and resignation from office, he kept on grabbing cash. He raked in about $15,000 a month as a consultant to private industry on, of all things, government. Now the Connecticut General Assembly wants to take a look at why felons are hired as consultants. Oink, Oink, Oink*

*Now comes news that a prosecutor may not have been able to avoid all the fun. Supervisory Assistant State's Attorney David Newman of New Haven is under the microscope, according to the Chief State's Attorney's Office. Suspicions that all is not well in the historic Elm Street courthouse. According to the New Haven Register, questions have arisen about whether Mr. Newman regards himself as a legitimate beneficiary of charitable contributions intended to resolve minor offenses. Charity for a Day*

*Newman has hired criminal defense lawyer Hugh Keefe, who tried to waive off the scandal as an "internal employment matter." Well, that's one spin. But Keefe is known for his defense of police officers in claims arising under 42 U.S.C. Section 1983 and for defending those accused of crimes. He's no employment lawyer. I Want Mine, Too*

**This comes on the heels of a report that a former prosecutor was arrested leaving the 50th birthday party of Chief States Attorney Christopher Morano**. *The former lawman was drunk, was carrying a little reefer, and was armed. He's now asking the court for a diversionary program that would permit the record of his arrest to be erased after a brief period of probation.*

*Wow. I guess there's no place like home for white collar crime, and, if you know the right people it seems that just about anything is possible.*

*March 29, 2005 | Permalink | Comments (2) | TrackBack*

Plaintiff KM Dickson would only add the comment that the residents of the State of CT would wonder how often these prosecutors get together to party, and what they discuss. CT State prosecutors breaking the law is the nature of this complaint. We victims of their crimes only wish the vast majority of crimes committed by State prosecutors and other state employees was limited to smoking marijuana.

**25- K) FALSE ARREST, NOT INVOLVING DCF:** Steven G. Erickson. In the case of Steven G. Erickson, It is Plaintiff KM Dickson's belief and knowledge that the testimony of Steven G. Erickson was truthful, in that Erickson believes that he wasn't getting equal protection and service being a Stafford Springs downtown Connecticut landlord.

Mr. Erickson, formerly of Stafford, CT, wrote letters to the editor critical of police and Connecticut courts and wrote President Bush a letter about how the economy was hurt by downtown (Stafford) property and small business owners getting a fair shake in courts and adequate police help and service. Mr. Erickson proposed Civilian Oversight of Police to State Senator Tony Guglielmo and former State Representative Mordasky. Mordasky's aid, "Rosemarie," advised Erickson that Erickson should sell his property and leave Connecticut before the Connecticut State Police retaliated for the laws Erickson proposed directing police powers, and for what Mr. Erickson had written critical of police in newspapers, and for being a "Big Mouth."

Mr. Erickson also attests that the Connecticut State Police were bragging that Mr. Erickson would be going to prison and run out of town after Erickson was attacked by Brian Caldwell on Erickson's property when Erickson returned home from a double shift of work. Caldwell had told Erickson's tenants Caldwell would kill Erickson when Erickson got home, and had threatened Erickson, harassed Erickson via voicemail, and beating on Erickson door after midnight, yelling that Caldwell, would cut Erickson's penis off if Caldwell caught Erickson outside Erickson's home.

According to Mr. Erickson, Connecticut State Troopers, Amaral and Langlais refused to take Erickson's complaint against Erickson's assailant who had jumped Erickson and tried to rob Erickson, nor would they take the complaint of witness Sue Johnston, nor that of Clayton Varno. Instead the police only arrested Erickson, refusing to view Erickson's injuries, and then later committing perjury of these facts to get me convicted of overreacting to being beaten during a robbery attempt using pepper spray.

Apparently, Judge Jonathan Kaplan of Rockville Connecticut Court stated that Erickson was guilty and was going to prison before Erickson's trial began. A videotape was shown to the jury of how to find Erickson guilty, but nothing about innocence or reasonable doubt, tainting them. (XXX, evidence #)

It is Erickson's belief that Judge Kaplan informed Erickson's attorney, Michael H. Agranoff (Stafford, CT), that Agranoff was not allowed to dispute police perjury, the prosecution, nor defend Erickson.

Erickson sent an email to the former Connecticut State Police Commission Arthur L. Spada in late October 2002, the day before Erickson was to be sentenced, asking Spada to remove the US Department of Justice webpage on Community Policing off the Connecticut State Police website, stating the policies were not being followed. Erickson indicated that Erickson was sending a copy of the email to the US Department of Justice.

Erickson believes the Connecticut State Police, the prosecutors, Erickson's lawyer, and Judge Jonathan Kaplan were acting in collusion to ensure Erickson's conviction to prevent Erickson from suing for Civil Rights violations and to keep Erickson from lodging complaints and exposing corruption within the courts and Connecticut State Police.

Erickson further asserts that Judge Jonathan Kaplan appeared to reference the email Erickson sent to Commissioner Spada at Plaintiff's sentencing, indicating to Erickson their was illegal collusion between Judge Jonathan J. Kaplan and Connecticut State Police Officers to ensure Erickson was convicted and given the maximum penalties allowed.

Mr. Erickson was sent to an overcrowded prison and was singled out for abuse by guards referencing Erickson's feud with the Connecticut State Police. Mr. Erickson was held in prison longer than his stated release date, wasn't allowed to take classes in prison as further harassment, and was told that Erickson wasn't allowed in Stafford, Connecticut upon release by LT Desso, also a Stafford town police officer.

Mr. Erickson asserts that he was told by his parole officer at the Enfield Police Station, that Erickson wasn't allowed to make complaints against police officers, nor contact the media regarding Erickson's case or face more prison time. These are clearly federal color of law, deprivation of rights, and violation of federally protected activities, and first amendment violations.

When Mr. Erickson was turned over to adult probation in Manchester Connecticut, Erickson was given told by Angela K. that she would violate Erickson's probation if she received any more calls regarding Erickson and would violate Erickson's probation if Erickson didn't leave the State of Connecticut. Mr. Erickson was given an hour to pack and leave the State of Connecticut to avoid further persecution and fraudulent prosecution.

**25-J) Jeffrey Yeaw** To Plaintiff KM Dickson's belief and knowledge, Mr. Yeaw was not provided equal protection under the law, was deprived of his civil rights, as were his children. These children were not reported as physically harmed or neglected by Mr. Yeaw in any way. This family's tragedy was another color of law abuse and illegitimate traumatization to children. Mr. Yeaw was arrested, and not his wife, **when all known reports are clear and convincing, that Mrs. Yeaw was physically violent to her husband**, and initiated an altercation. Mr. Yeaw's children were taken by DCF, and Mr. Yeaw, being of sound mind and familiar with DCF abuses, merely rescued these children. Instead he was charged with the "crime" of abducting his own children. **[EXHIBITS II]**

Plaintiff KM Dickson wishes she had the courage to rescue her own children, but it never occurred to this Plaintiff. At that, Plaintiff Dickson never anticipated her children being taken, since there was no abuse or neglect going on, and everyone knew it. DCF threw out their first petition against this Plaintiff and wrote a new one.

Now Mr. Yeaw faces years in prison, because his wife attacked him, and he left the house in response. The present Governor, Rell, publicly commented on this crime, when she did not know it was not a crime. This is disheartening to CT residents, since we had faith that this replacement Governor, Mrs. Rell, for Governor Rowland, was Number One, a woman, and Number Two, got rid of a number of the cronies

hired by Rowland. Rell did not get rid of DMHAS' or DCF's commissioners, however, when we know both agencies are abundant and obvious failures.

No one should have been arrested in any of these "cases." Were it not for the incompetence and abuse by DCF and the prosecutorial madness in the State of Connecticut, and were it not for the failure of the mental health system, some of these cases would, from an outside observer, appear be family arguments. Instead, they became obvious cases of discrimination and retaliation, and then numerous and extreme civil rights violations, including false criminal charges, prison sentences and threats of permanent incarceration, under the apparently **Secret Connecticut "We'll Commit You Permanently and Take Your House and Income if You Don't Shut Up, by Inventing Your Crimes, and then Committing You to a Psychiatric Hospital, Indefinitely, For Saying You Are Innocent" Act.**

That the DCF would record family arguments as neglect of children, implies that nearly all Connecticut children would have to be removed from their parents.

Given DCF's civil rights violations and false criminal charges, to known and unknown numbers of parents and children, and the fact that the DCF is well-known to be "arrogant and inept," as regards children and families, Jeffrey Yeaw was competent, correct, sane, protective, caring and fully within his rights to rescue his children from **the abomination known as the CT Department of Children and Families.**

It is Plaintiff KM Dickson's belief that the evidence submitted supports that no children are safe in DCF's "care," and due to the presence of the Rowlandgate Appointee US Attorney Kevin O'Connor, justice cannot be gained in the US Department of Justice District of Connecticut.

---------------------------------------

**DAMAGES AND RELIEF REQUESTED**

1) The Connecticut Department of Children and Families is to be dissolved completely and all related DCF statutes stricken from Connecticut General Statutes.
2) $100,000,000 in pain and restitution of costs to Plaintiff Dickson and her children from the State of Connecticut.
3) The establishment of a research clinic and hospital for vector borne diseases, in Connecticut, to be named the Hospital of the Immaculate Heart, with the funds recovered in the discovery of scientific fraud committed by Yale University, the Yale Corporation, and to include the criminal prosecution of all Yale- and Lyme-related perjury anywhere to be found in America.
Plaintiff Dickson will manage this organization, which will restore the earlier meanings of "care" and "integrity" to the English language.
The $100,000,000 million in damages from the State granted to the Plaintiff shall be donated to this establishment, the Hospital of the Immaculate Heart.
4) AAG Jessica Gauvin is to be criminally charged with making false statements to police and Gauvin shall be asked to leave the State of CT permanently after her criminal sentencing.
5) A forum for redress of all DCF perjury committed in the last 15 years, and the return of fraudulently taken children by CT DCF.
6) The prosecution of MARC S. RYAN and KRISTINE RAGAGLIA for conspiring to defraud the federal government as regards child welfare, and the incarceration of children as policy, over care.
7) Federal oversight of the CT Department of Justice, and the Chief State's Attorney's Office.
8) The return of Plaintiff KM Dickson's children to Plaintiff KM Dickson's care, and in sole custody.

Signed this 27 day of July, 2005

Kathleen M Dickson
Kathleen M. Dickson, et al And on behalf of children's
23 Garden Street
Pawcatuck, CT 06379

Lara Dickson
Lara E. Dickson

Diane M. Dickson
Diane M. Dickson

David Dickson
David D. Dickson