**COMPLAINT**

Kathleen M. Dickson, and
on behalf of Lara E. Dickson,
Diane M. Dickson, David D. Dickson, et al,
and on behalf of all Families and
Children of the State of Connecticut

In the cause of a class action:

**CA 05- 328 T**

v. STATE OF CONNECTICUT

US DISTRICT COURT
1 Exchange Terrace
Providence, Rhode Island 02903

**August 22, 2005**

AMENDED
**~~MOTION TO AMEND~~ COMPLAINT**
KMD 22-Aug-05

Contents:
CORRECTIONS – page 1
SUMMARY OF COMPLAINTS, AMENDMENTS AND MOTIONS – page 2
CASES – page 3
THE SCIENCE - page 11
THE NON-SCIENCE - page 17
THE NOV 20, 2003 DATABINDERS –page 19
STATUS –page 23
ABUSE AS POLICY- THE 10-FOLD INCREASES- page 25
THE REALITY OF FORENSIC PSYCHIATRY- page 28

**CORRECTIONS:** To Amendment and motion dated August 3, 2005. Plaintiff Dickson was mistaken about Mr. Kevin O'Connor, the present US Attorney for the District of CT, as having been a former New Britain State prosecutor, having a reputation for the highest number of death penalty convictions in the history of the State.

The Plaintiff Dickson should have known better than to assume this statement had any legitimacy, since a prison guard or judicial martial informed Plaintiff of this untrue history as we drove into the parking lot of the New Britain courthouse, during one the Plaintiff's many trips to courthouses to listen to even more nonsense, false criminal charges, and perjury.

Plaintiff KMDickson apologizes to Mr. O'Connor for this gross lapse in fact-checking. Plaintiff Dickson would still like to be informed of the history of Mr. O'Connor's placement as US Attorney in Connecticut, since one of the secretaries in Mr. O'Connor's New Haven office also informed Plaintiff Dickson that Mr, O'Connor's wife worked on former Governor John Rowland's re-election campaign. We should all know better than to believe anything any state and federal employees say, and ***especially*** the Plaintiff Dickson should know this.

**SUMMARY**

The original complaint Docket Number 5 328T filed in Rhode Island Federal Court was a summary of examples of incompetence and abuse of CT residents illegitimately caught up in "the system," who essentially needed assistance from the State. They ended up being victims of the crimes of CT State employees, and then had their lives and their families lives ruined under various federal civil rights violations, violations of the Americans with Disabilities Act, First Amendment, Fifth Amendment, and the failure of the State's various commissions to understand what duties they are commissioned to perform. The only service the State evidently provides is abuse or neglect. This was substantiated in the CT VOICES FOR CHILDREN report regarding the CT Department of Children and Families (DCF), entered as **Exhibit F, Docket 5-328 T.**

The first amendment to this complaint, dated August 3, 2005, contains a motion for appointment of counsel who is competent to be a US Attorney, due to the racketeering and organized crime surrounding State agencies and as regards the scientific fraud of "Lyme disease." Plaintiff retracts the statement made about Kevin O'Connor in section of this document, in item, "dd" which states: "Mr. O'Connor, to the Plaintiff KM Dickson's knowledge, was a former State of Connecticut New Britain prosecutor, and has a record for the most death penalty convictions in Connecticut."

**AMENDED COMPLAINT:**

This current Plaintiffs motion to amend the class action against the State of Connecticut is to now include all people abused and neglected by the Department of Mental Health and Addiction Services, the Department of Mental Retardation, and the CT Division of Criminal Justice - persons who have documented mental impairments, and as represented by the following cases of cognitive or mental disability: mental retardation, Alzheimer's and Parkinson's and other dementias, the neuropsychiatric disease Multiple Sclerosis, and the brain damage incurred by psychotropics.

The CT competency statute 54-56D assumes the State DMHAS staff is competent to brain matters. DMHAS is not competent, as previously described, and as will be demonstrated below in this second amendment to the class action complaint 05-328 T.

Other statutes violated include the virtual declaration of non-human status for CT's alleged defendant John M, which is clearly a violation of every known USA civil rights statute, and UN's international human right declarations, as previously mentioned (Deprivation of Rights, Color of Law, Conspiracy to Deprive of Rights, United States Civil Code: Titles 18, Secs 241, 242, 245, Americans With Disabilities Act.)

**CASE EXAMPLES:**

1) **John M**. is a young adult with mental retardation, yet he has been housed in a CT prison since February 2005 for 2 counts of sexual assault 4th degree and risk of injury to a minor.. His family has been denied the right to see the warrant and specific charges against him, because they involve a minor boy. John M. has been determined competent to stand trial, although his family states that he was given a competency evaluation, which the family has not seen, and their request to see it has not been granted by

the State. The family was only told verbally that John M. is competent to stand trial. John M. has been kept in prison these last 6 months.

The family states John M. was raped in prison, and that it took almost a month for the prison doctor to investigate. John M. was raped in one prison, and was examined in another. Naturally, the guards denied it happened.

A letter written by Annette Rose, DMR Case Manager, which is **EXHIBIT KK**, dated October 22. 2004, states:

> **To Whom It May Concern:**
>
> **Please be advised that John M., date of birth 11-07-80, was determined eligible for Department of Mental Retardation Services by H. Steven Zuckerman, PhD., Supervising Psychologist 2. According to Elibigibilty Determination document signed by Mr. Zuckerman and dated 08-14-98, John M. "falls withing the Mild range of Mental Retardation." This document can be found in Mr. M.'s Department of Mental Retardation case record.**

In the letter on behalf of John M. was written by Brian O'Rourke and Ellen Gilman of the Office of protection and Advocacy for Persons with Disabilities, Hartford, CT, **[EXHIBIT 5-328T LL]**, they state:

> **"Mr. M's habilitation cannot be addressed in a correctional facility. His cognitive limitations combined with a history of behavior adjustment difficulties increases the serious risk prison incarceration posess to his personal safety and psychological well-being. As you are aware, prisons can be especially dangerous environments for individuals being held on (or convicted of) charges of the nature he is facing.**
>
> **Mr. M.'s past psychological reports cite significant language processing deficits. His language processing becomes further compromised when John becomes anxious. This factor does interfere with his ability to cope with his current situation. Mr. M's mild retardation, in addition to these deficits places him at a serious disadvantage as he attempts to work with his attorney in defense of these charges. When we met with Mr. M., we found *that he had a great deal of difficulty participating in a simple conversation about his present* circumstances.**
>
> **Mr. M's history shows that he needs significant support to reinforce his awareness and acquisition of appropriate social skills. The Department of Mental Retardation should have reevaluated Mr. M's service and support needs over a year ago, when allegations of**

> **criminal conduct were first made. The development and implementation of an individualized service plan needed to occur at that time.**
>
> **As a resolution to this Programmatic Aministrative Review request, we ask that the DMR immediately identify an emergency (short term), community based residential placement for Mr. M., and that Mr. M.'s attorney, Mr. John Coccio be informed of this option. Once in placement, we request that the DMR complete any relevant assessments and develop a well-designed community-based support propgram to meet Mr. M's long term needs."**

This letter was written April 11, 2005, and is a comprehensive and adequate attempt to have a rational grasp of the needs and the urgency that Mr. M's be treated as a person with mental retardation. Again, they state:

> **Mr. M's mild retardation, in addition to these deficits places him at a serious disadvantage as he attempts to work with his attorney in defense of these charges. When we met with Mr. M., we found that he had a great deal of difficulty participating in a simple conversation about his present circumstances.**

This would appear to resoundingly dispute any legal competency of Mr. M. that the State's attorney's office has arbitrarily - and without producing the documentation of - asserts exists. Further follow up with the Department of Mental Retardation suggests strongly that there is no alternative housing for John M., yet the State also claims to have 16,000 residents in CT with mental retardation and that 1% of the population has mental retardation (IQ of 70 or below). The website of the DMR states that:

> **"Unlike other agencies, its supports and services (with the exception of Birth to Three), are not an entitlement for people with mental retardation and the majority of its services are provided by private non-profit organizations in local communities.**

This gives the appearance that like the DCF, the DMR provides no real services, other than the pay checks of the employees. There is no housing available for these people, when one would think such would be a priority, since one thing there is no denying exists is mental retardation. Autistic people belong to this department.

Autism is an epidemic, yet instead of planning for this epidemic or Lyme disease, and seeking appropriate federal funding, the State planned for an increase in prison cells, as previously mentioned.

In an email to Ms. Ellen Gilmartin, Gino DeMaio, Forensic Coordinator, State of CT Department of Mental Retardation, states that **"John has asked DMR to not attend these hearings and has not wanted his case manager to be involved." [EXHIBIT MM]**

The family who had been the guardians of John M. state that no such conversation took place. They state that John cannot even make change, and once bought a pack of gum from a child for 5 dollars, not knowing that a pack of gum costs nowhere near 5 dollars.

H. Steven Zuckerman, PhD. Of DMR on September 14, 1998, **[EXHIBIT NN]** states that as regards John M.,

> **"Based on the information presented to me, this individual does meet the definition of mental retardation as defined in CGS Section 1-1g, and is therefore eligible for Department of Mental Retardation services. This individual falls within the Mild Range of Mental Retardation."**

Listed as requirements for this condition are under Connecticut General Statutes 1-1G.

> **"For the purposes of sections 4a-60,. 17a-274, 17a-281, 38a-816, 45a-668, 45a-684 inclusive, and sections 46a-51, mental retardation means a significantly subaverage general level of functioning existing concurrently with deficits in adaptive behavior and manifested during the development period."**

The family of John M. state that the incident for which he is in jail took allegedly took place on November 1, 2003, yet it wasn't until the summer of 2004, when John M. and his cousin tried to attain a minor position either in the local fire department, or be volunteers or trainees, did anyone take any legal action. John M. went to jail in February 2005 and has been there since, without his family being allowed to know exactly what he is being charged with, who performed the competency evaluation, or any of the important details of the case. The family states that they don't even know how the case was transferred from Norwich, where the family lives to the New London courthouse.

There was apparently another nephew involved, and the State prosecutor combined cases with no explanation as to how all these events took place.

Years before, apparently, the retarded boy's uncle proposed citizen oversight of the police. John M. was apparently involved in an incident at Walmart where a child was in the men's room and could not get his pants down to go to the bathroom, and the parent was nowhere around, so John M. helped. Walmart hires retarded people and are familiar with the difficulties of retarded people, and of course were willing to let the whole event drop, to the best of this Plaintiff's knowledge. There is little documentation of events available, and that would be because the public does not know what they are up against, if they become the arbitrary victims of crazy people who know how to use the DCF and the police to their advantage. Hopefully this complaint will alert the residents of Connecticut to the hazards of being a Connecticut residents, before the adequate resolution of these crimes, as described as relief and damages in the original complaint Docket 5- 328 T, dated July 27, 2005.

One can see how this Walmart event would get mixed up, and that it is impossible to tell what happened if John is mentally retarded, and as is known of him:

> **"Mr. M.'s past psychological reports cite significant language processing deficits. His language processing becomes further compromised when John becomes anxious. This factor does interfere with his ability to cope with his current situation. Mr. M's mild retardation, in addition to these deficits places him at a serious disadvantage as he attempts to work with his attorney in defense of these charges. When we met with Mr. M., we found that he had a great deal of difficulty participating in a simple conversation about his present circumstances."**

It was after this Walmart incident that John M. uncle proposed citizen oversight of the police. One can see that what we have is in reality, two sets of parents of young children, only one looks a lot older. Both are equally concerned about their children.

It appears as though there is a tremendous tug-of-war over bodies, between the Department of Criminal Justice, the Department of Children and Families, the Department of Mental Health and Addiction Services, but oddly, not the Department of Mental Retardation. Each has their own set of statutes, and the only mediator, the Department of Protection and Advocacy for Persons with Disabilities, appears to be powerless.

There are numerous free assistance agencies in the State of Connecticut but they don't actually do anything for anyone, even if one is lucky enough to get one of them to call back. This is not only the Plaintiff Dickson's experience, but was the experience of every single person who was dragged through the Connecticut Valley Hospital as "incompetent." Not too many of the "criminals" were incompetent, if they knew how to look for help. The help was incompetent, and one wonders of these non-profits take federal funding to provide no service. It did not take long before we "prisoners" we all joking about what a waste of advertising and publishing these alleged non-profit legal help groups expend, and especially, about our coins for the pay phone, which were wasted. It is well known that a CT public defender is called a "public pretender," and the only people who can emerge from this potentially permanent trap are those who have family support on the outside.

Frequently enough to be a recognizable phenomenon, as in the evidence of many of the women in prison, whoever goes to jail, in family disputes, is a matter of who called the police first. Then of course, once one person has a record, those persons are always assumed to be guilty in subsequent disputes, which involve altercations and then the police. One prison guard told the Plaintiff that people routinely place their relatives in prisons just to get rid of them because they are a nuisance. Plaintiff Dickson only heard abundant evidence to support that this is true from listening to a vast number of the inmates at York.

It appears that just as it is well-known that the DCF can be used as a weapon, so to can the police be used as a weapon. Hearsay is plenty good enough for DCF to fraudulently take anyone's children away. No

one has ever been prosecuted for false allegations of child abuse or neglect in Connecticut. The DMHAS employees also refer to CT as a "Meat Grinder." They have seen this abuse enough times. Lower level DMHAS employees are remarkably more sane than their supervisors and more sane than the DMHAS "doctors." They are more sane than corrections officers, police, and DCF "social workers," to their credit. These mental health workers and nurses at the CVH "competency restoration unit" should all get the salaries of the police and corrections officer and DCF workers, while all of the latter 3 groups should be fired. DMHAS mental health workers and nurses are in a class unto themselves in the state of Connecticut (at the present time).

2) **Marsha Hoggan**, 55, is an Alzheimer's patient who also has Parkinson's disease. (These two disorders of brain damage also occur in Lyme borreliosis.) Ms. Hoggan is accused of stuffing tissues in her roommate's mouth and cotton balls in her nose, where they lived together in a nursing home. The roommate's name was Eleanor Mazzarella. Mazzarella died in March 2005 from unrelated causes and was 74 at the time of her death. Ms. Hoggan has claimed she did not know what crime she committed and is now in the York Women's prison where she is mistreated and is treated to more medical and nutritional neglect, since the nutrition in the prison is grossly inadequate. The inmates in the mental health wing cannot buy vitamins or coffee. Stimulants are known to be helpful for people with, dementia, cognitive decline, and the associated depression.

None of the inmates at York get adequate exercise, since the only two exercise bikes in the prison are broken and there is no other recreational equipment except balls, basketball hoops, and sometimes a volleyball net. The guards are forever looking for a reason for the prisoners not to go to the gym or to the library. Prisoners are not allowed to jog on the grass. Prisoners can only go to the library, once a week and only approximately 5 out of 20 get to go, they are picked randomly, and some never get to go to the library. Some of the ward TVs are broken, and some have no reading materials. Thus, there is no

intellectual stimulation whatsoever for a great many inmates. These combined conditions contribute to dementia. In the prison there is no education about nutrition, no nutrition, no education about diet and exercise, and no exercise, when clearly all these are needed to restore many of these women in the prison. Most of them are drug addicts and in poor health. A great majority of these prisoners go over to "mental health" to get some kind of drug to sleep their sentences away, but this increases the illegal-drug induced dementia.

Thus, no prisoners will improve in any way, under "corrections." There is no incentive on the part of corrections officers, for the prisoners to not be prisoners, because of all the overtime pay these guards get. Therefore the cycle of abuse is perpetuated by the guards and their union. Prisoners return to prison after having been arrested again for self-medicating too often. How prisons are managed does not make any sense for dealing with human beings in any way, with the exception of mass murderers, who are rare.

The most adverse treatment for older women in cognitive decline are central nervous system depressants such as antipsychotics and this announcement was made in 2005 by the National Institute of Mental Health. A trial of Seroquel for agitation in dementia was halted because it was observed that this treatment accelerated the dementia. The monograph for risperidone states that this medication is associated with greater extrapyramidal effects (extrapyramidal brain damage) in older women, especially.

It would appear to the casual observer that the liability in this Hoggan case was more the nursing home's, rather than the incompetent patient's.

3) **Leslie Andino** a 23 year old woman with multiple sclerosis, dementia and depression - which sounds very much misdiagnosed Lyme Neuroborreliosis - was arrested and charged with arson in a nursing home fire that killed 16 other residents in Connecticut in May 2003. After several periods of "treatment" to restore competency for trial for a crime she never should have been charged with in the first place, she

returned to the courthouse in January 2005, "heavily sedated," to learn she would be committed to the Whiting Psychiatric Prison.

Heavy sedation is malpractice for a neuropsychiatric disease, and likely contributed to her increasing dementia. The American Psychiatric Associations Guidelines on the treatment of a delirium state that: **"Medications for psychiatric disorders can be both the cause of delirium and exacerbate or contribute to delirium from other causes."**

This Andino case should be investigated by a competent independent federal health official and expert, which would obviously not be one from Connecticut.

It would appear to the casual observer that the liability was more the nursing home's, rather than the incompetent patient's.

**THE SCIENCE**

Conditions associated with Multiple Sclerosis, according to the United States National Institute of Health are:

"**Symptoms** *Return to top*

- weakness of one or more extremities
- paralysis of one or more extremities
- tremor of one or more extremities
- muscle spasticity (uncontrollable spasm of muscle groups)
- muscle atrophy
- movement, dysfunctional - slowly progressive; beginning in the legs
- numbness or abnormal sensation in any area
- tingling
- facial pain
- extremity pain
- loss of vision -- usually affects one eye at a time
- double vision

- eye discomfort
- uncontrollable rapid eye movements
- eye symptoms worsen on movement of the eyes
- decreased coordination
- loss of balance
- decreased ability to control small or intricate movements
- walking/gait abnormalities
- muscle spasms (especially in the legs)
- dizziness
- vertigo
- urinary hesitancy, difficult to begin urinating
- strong urge to urinate (urinary urgency)
- frequent need to urinate (urinary frequency)
- incontinence (leakage of urine, loss of control over urination)
- decreased memory
- decreased spontaneity
- decreased judgment
- loss of ability to think abstractly
- loss of ability to generalize
- depression
- decreased attention span
- slurred speech
- difficulty speaking or understanding speech
- fatigue, tired easily

Additional symptoms that may be associated with this disease:

- constipation
- hearing loss
- positive Babinski's reflex

Note: Symptoms may vary with each attack. They may last days to months, then reduce or disappear, then recur periodically. With each recurrence, the symptoms are different as new areas are affected. Fever can trigger or worsen attacks, as can hot baths, sun exposure, and stress."

Symptoms associated with Dementia, from NIH MedLine Plus include:

> **"Disorders that contribute to confusion should also be treated. These include heart failure, decreased oxygen (hypoxia ), thyroid disorders, anemia, nutritional disorders, infections, and psychiatric conditions such as depression. Correction of co-existing medical and psychiatric disorders often greatly improves mental functioning."**

Symptoms associated with Neurologic Lyme disease, as listed by the National Institute of Neurological Disorders and Stroke:

> **"Neurological complications most often occur in the second stage of Lyme disease, with numbness, pain, weakness, Bell's palsy (paralysis of the facial muscles), visual disturbances, and meningitis symptoms such as fever, stiff neck, and severe headache. Other problems, which may not appear until weeks, months, or years after a tick bite, include decreased concentration, irritability, memory and sleep disorders, and nerve damage in the arms and legs."**

The hypoxic state of Lyme and multiple sclerosis is often assessed with brain SPECT scanning, and often shows a deficit, and which is known to be associated with an organic delirium. According to Allen Steere:

> **"Lyme disease may affect the central nervous system causing organic brain disease or syndromes suggestive of demyelination."** PubMed ID 2742551

The same symptoms as those in neurologic Lyme disease occur in Multiple Sclerosis and Alzheimer's disease. In fact, in a recent report:

> **"The cause, or causes, of the vast majority of Alzheimer's disease cases are unknown. A number of contributing factors have been postulated, including infection. It has long been known that the spirochete Treponema pallidum, which is the infective agent for syphilis, can in its late stages cause dementia, chronic inflammation, cortical atrophy and amyloid deposition. Spirochetes of unidentified types and strains have previously been observed in the blood, CSF and brain of 14 AD patients tested and absent in 13 controls. In three of these AD cases spirochetes were grown in a medium selective for Borrelia burgdorferi." [Pubmed ID** 15665404 Miklossy, et al**]**

The proper term for the entire scope of disease manifestations is "Lyme borreliosis." "Lyme disease" refers to 72% of the late Lyme arthritis cases only, and only as compared to this Lyme arthritis case blood to the high passage strain G39/40. "Lyme Disease" is thus an imaginary entity as previously described.

The CDC and NIH expressed a request not to use high passage strains of borrelia and not to use strain G39/40 to use for the determination of Lyme disease because it did not express enough of an antigen of diagnostic value at the 1994, Dearborn Michigan, CDC meeting on serodiagnosis (blood tests) of Lyme, yet this is the strain and conditions of the strain which now represents the CDC's IgG serodiagnostic

standard. CDC and the NIH have not responded adequately to Plaintiff's complaint that this is deliberate scientific fraud. To the Plaintiff's knowledge, the FBI is still investigating this complaint.

Lyme borreliosis has been associated with the two haplotypes or genetic markers that occur in multiple sclerosis, narcolepsy and lupus (HLA-DQB1*0602), but the public is not allowed to know this, because this form of Lyme is also "seronegative." "Seronegative" really means the testing for Lyme is fraudulent, and this is discussed in greater detail in 3:05 CV 91 (CFD), as regards the racketeering-influenced and corrupt organization's control of what we are told about "Lyme disease." The second haplotype discovery was made by Mark Klempner of Boston University and that haplotype is HLA-DQB1*0602. The State of CT is in possession of the July 2001 audio-taped Mark Klempner conference, during which this scientific data about the susceptibility to chronic Neurologic Lyme/MS and a copy is the US Attorney's office in New Haven, CT.

There are numerous and conflicting protocols for the treatment of Lyme borreliosis. The Centers for Disease Control supports the fraudulent one developed by the RICO entities, the American Lyme Disease Foundation and Yale University, even though the CDC knows this protocol is not supported in the literature with the scientific facts. The elements of these crimes are described in greater detail previously in 05-328 T, District of Rhode Island and in 3:05-CV-91 (CFD), District of Connecticut.

It is not known what other "treatments" Ms. Andino were given by Connecticut Valley "Hospital," but given the Plaintiff's experience with CT DMHAS, Plaintiff is seriously concerned about how DMHAS treats any of their victims. DMHAS perjured themselves in the false criminal case against Plaintiff KM Dickson does not have Lyme disease, and that Lyme is not a brain disease.

James Phillips, MD was given the scientific substantiation that Lyme is a neuropsychiatric disease. Plaintiff KM Dickson's website "The Lyme Disease Dilemma," was given to James Phillips, MD, in full hard copy in November 2000.

The Lyme Disease Dilemma website has not been touched (not been modified at all) since November 2000, and ActionLyme.50megs.com has not been touched (not been modified at all) since November 2001. The URLs for these websites are:

http://www.geocities.com/kmdickson0308/lyme-dilemma.html and

http://actionlyme.50megs.com/

A sampling of their content:

***"NEWS-***

***The new information that confirms the pathophysiology of MS and Lyme has not been published, yet this data was collected during the 1997-2000 NIH Chronic Lyme Disease treatment trial by Tufts: The high incidence of the presence of HLA-DQB1*0602 on Chronic Lyme patients. To quote Dr. Klemper:***

***"It turns out that if you look at the first 51 patients with post- treatment chronic Lyme disease, the patient population that participated in our study, there was a very high incidence of DQB0602 with an odds ratio of 770%. So it may well be that exposure to THAT organism with THAT background of HLA haplotype may lead you to develop chronic symptoms. That is a hypothesis that needs to be tested. It would obviously lead to an entirely new form and approach to therapy."***

***The non-reporting of objective data over the reporting of subjective, invalid data (the assessment tools FIQ and SF-36), calls into question integrity in reporting scientific data, and the validity of further and previous conclusions from such analysts. The FIQ was never validated for Lyme disease. The SF-36 is not to be used in cases of cognitive impairment.***

The record of this presentation by Mark Klempner is **EXHIBIT OO.** The rebuttal to Klempner's "study" on the treatment of chronic Lyme disease is **Exhibit PP,** and can be found online at

**http://www.ilads.org/files/position2.pdf**

Plaintiff Dickson was the original author of this rebuttal, but at that earlier time, looked more like a point-by-point rebuttal to the validity of 1) Klempner's inclusion and exclusion criteria; the validity of the

CDC's blood testing standard for Lyme disease, 2) a refutation that the FIQ had been validated (the validation showed a difference between Lyme and Fibromyalgia, so by definition, the FIQ was not valid to assess Lyme patients), 3) Mark Klempner most certainly is aware of the various markers of disease such as matrix-metalloproteinases (MMP) in the spinal fluid of Lyme borreliosis patients, and should have been looking for these and other known objective markers of disease since Klempner discovered and reported this MMPs analysis in Neuroborreliosis patients, 4) Mark Klempner published that intracellularity of the Lyme spirochete and the availability of host cells in other ways provided protection for the Lyme spirochetes from being killed by ceftriaxone, 5) Mark Klempner discovered the reason people who are the most ill with Lyme disease are seronegative: They don't have the hypersensitivity reaction of people who have the genetic predisposition to Lyme arthritis (hypersensitivity or allergy reaction) discovered by Allen Steere (and was the basis of the class action lawsuits against SmithKline, and about which Attorney Steve Sheller had to say of the CDC: **"The CDC is a disgrace. It is a corrupt organization. The drug companies have them on their payroll."**), because they tend to have these immune-incompetent haplotypes associated with persistent central nervous system infections, and 6) Mark Klempner refused to tell the Plaintiff KM Dickson which primers he used to determine that among his 2000 patients, none had a positive Borrelia burgdorferi positive DNA analysis of their spinal fluid. 7) Lyme neuroborreliosis is usually an aseptic meningitis, so looking for increased cells, which was what Mark Klempner did, in the spinal fluid of these patients was a waste of taxpayers' money. 8) Some of the known and published markers of disease process (the reason there are clinical signs of illness) are described in the RI Tick Borne Diseases Management Plan, entered as **Exhibit Q** in the original complaint dated July 27, 2005. Therefore Klempner's "Breaking News" published early from the New England Journal of Medicine June 12, 2001, was utterly insulting silliness.

The full transcript of Klempner's 2001 South County RI "Diseases of Summer" conference is **Exhibit QQ.** The secret MS-haplotype data is on page 7. Klempner later goes on to describe patients' illness

complaints, which were relapsing and remitting (like relapsing fever borreliosis and like relapsing remitting MS), as possibly due to placebo effect.

> **"So, in part, this validates exactly what patients have been saying right along. And that is, "Some of us get better when we take antibiotics." It's absolutely true. Uh, it's also true the same number of patients get better when they take placebo."**

What Mark Klempner should have said was that unless we know what people are infected with by using the correct primers, and unless we know who has a susceptibility to chronic central nervous system infections, and unless we are allowed to know what are the valid, objective, markers of disease, victims of these infections and the related medical crime of Lyme borreliosis can continue to be abused, denied treatment, and labeled hypochondriacs. The same system of abuse applies to people who have Chronic Fatigue Syndrome and Fibromyalgia: use invalid medical tools to assess and use invalid psychiatric terms and invalid questionnaires rather than take real biological samples and determine if there are objective, scientific signs and EVIDENCE that something is really wrong.

Klempner's fraudulent study of the treatment of chronic Lyme is sometimes referred to as Evidence-Based Medicine. Hopefully the public will now have a better idea of what "Evidence-Based Medicine" means and not become victims of it.

One can artfully and deliberately not find the targeted DNA in borreliosis if one is targeting plasmid and not chromosomal DNA, and which is done routinely when anyone uses an OspA or other plasmid primer. Anyone who pays for a DNA test for Lyme should not pay for the test unless the DNA targeted is from the chromosome, preferably the flagellin DNA.

**THE NON-SCIENCE**

James Phillips is an associate clinical professor of psychiatry for Yale University and is a forensic psychiatrist for the State of Connecticut, yet perjured himself as regards Lyme and the Plaintiff KM

Dickson in order to avoid a malpractice lawsuit. Subsequent to that, the DMHAS "Medical Director," Kenneth Marcus, testified at Plaintiff Dickson's DCF "trial" and co-perjured himself saying you treat Lyme delirium the same way you treat any other psychosis.

The American Psychiatric Association's Guidelines state that:

> **"Medications for psychiatric disorders can be both the cause of delirium and exacerbate or contribute to delirium from other causes."**

This was an extremely detrimental act of deliberate harm against not only CT Lyme victims, child and adult, but all victims of Lyme borreliosis, as well as Multiple Sclerosis, and all organic delirium patients around the world, since the American Psychiatric Association's guideline say otherwise, as do the monographs for these "drugs." However the 1) value of Phillips' and Marcus's testimony, and 2) the psychiatrist Patricia Leebens having defrauded the court over the Plaintiff's **11-16-03 databinders**, and 3) then having left the country so that she could not be cross-examined in Plaintiff's DCF case, regarding the temporary which became permanent order of custody, through again, total perjury, and 4) for the CT Department of Mental Health and Addiction services' Vladimir Coric and Betsy Byron to have perjured themselves with abandon is an extremely important lesson to all Americans regarding what they are potentially dealing with, when they are dealing with psychiatrists. Psychiatrists blame the patient for the damage that they cause and psychiatric diagnoses are every bit as harmful as the older terminology which they replaced: Psychiatric terminology can define for the world that anyone is a "bad" person, not only with no evidence, but made-up (psychotic, scientifically invalid) terminology (neologisms) and with the intent to harm.

Psychiatrists try very hard for the public to not be made aware that psychiatry is not a medical or scientific practice, but all one has to do is consider what they do with their time. Psychiatrists are not in laboratories. The pharmaceutical chemists are in the laboratories, the pharmaceutical sales people tell the psychiatrists what they found, and whoever objects is called "crazy" or is threatened- a convenient little

arrangement. This is almost as convenient as calling people who have a permanent brain infection like Lyme borreliosis, "crazy," and not sick.

The pathophysiological markers of disease in Lyme borreliosis were given to the State of CT on numerous occasions, as well as was the Management Plan for the State of Rhode Island Tick Borne Diseases Commission in a hearing held in Rhode Island in April 2002 **[EXHIBIT Q]**

The published scientific documentation of the various Pathophysiologies of Psychotopics-Induced Brain Damage were also given to the State of CT on numerous occasions, most particularly on **November 20, 2003**, when they were given to Laura Lustig of the New Learning Center, Westport, in person, by Plaintiff KM Dickson, in a 1-1/2 inch databinder, along with the **11-16-03 databinders.** The **11-16-03 and 11-20-03 databinders** are in evidence in 3:05-CV-91 (CFD). The State of CT is in possession of them (DCF and Patricia Leebens), and Yale, a defendant in 3:05- CV-91 (CFD), has them, since Patricia Leebens works also for Yale in the Yale Child Study Center and she mentioned them in the Order of Custody, November 26, 2003.

Plaintiff's children were kidnapped 6 days later by the CT Department of Children and Families, who defrauded the court over these, the Plaintiff Dickson's substantiated replies (the content of **11-16-03 databinders)** to complaints to the CT Commission on Human Rights and Opportunities and Statewide Bar Counsel (CT attorney ethics/grievance committee) Gerald P. Dwyer, Esq. and 5 others. On November 20, 2003, both databinders were hand-delivered by the Plaintiff Dickson to Laura Lustig. Lustig's second ranking administrator in her private organization, "The New Learning Center," Westport, CT, was a former DCF commissioner named Mark Marcus. It is not known if Mr. Marcus violated the State's revolving door policy, since Laura Lustig also had a contract to train DCF "workers."

These **11-16-03 3 inch thick databinders** contained data regarding Lyme disease and the Plaintiff's attempts to get assistance from the State, and communicate with the State of Connecticut, as regards Plaintiff Dickson's and her children's Lyme disease, and as regards which the CT DCF then again perjured themselves. Plaintiff Dickson first asked for DCF's assistance, because she was mistakenly thinking the DCF was a child welfare agency, in 1996. DCF denied helping then, and then DCF denied that they denied helping the Plaintiff KM Dickson. Plaintiff now knows no one wants DCF's "help," because the vast majority of the DCF staff are criminally insane. The majority of DCF employees fully meet the criteria of sociopaths, as previously demonstrated in the Amended complaint dated August 3, 2005, and who constantly violate CT state and federal law, as described in the original complaint Docket Number 5-328 T, US Court, District of Rhode Island.

**THE NOVEMBER 20, 2003 DATABINDERS**

The content of the following reports, contained in the **11-20-03 databinders,** is extremely significant, and presents numerous domains of liability to the State of CT DCF and DMHAS. Among those scientific reports are:

**1) 1989 Infectious Disease Reviews, Supplement, Lyme Disease and Other Spirochetal Diseases**, Various Titles.

The content of that Infectious Diseases Society Supplement essentially states that Lyme is a borreliosis, and the treatment endpoint is still not known. This is because Lyme is a borreliosis, which is a relapsing fever organism, and borrelia permanently infect the brain. Explained another way, by Alan Barbour, the owner of the ImmuLyme vaccine patent:

> **"Lyme disease and relapsing fever. These tick-borne infections are notable for multiphasic antigenic variation through DNA recombinations in the case of relapsing fever, the occurrence of chronic arthritis in the case of Lyme disease, and invasion of and persistence in the brain in the case of both diseases.** – from Alan Barbour's website.

**2) *Genetic animal models: focus on schizophrenia,* Gainetdinov, RR., et al. TRENDS in Neuroscience, Vol 24., No. 9, September, 2001**.

At this point in history, these psychiatrists have no idea what the drugs targets are and are leaning towards considering the scientifically valid in their future approach.

**3) "Loss of striatal cholinergic neurons as a basis for tardive and L-dopa-induced dyskinesias, neuroleptic-induced supersensitivity psychosis and refractory schizophrenia." Miller R, Chouinard G., Biol Psychiatry. 1993 Nov 15;34(10):713-38.**

Abstract: **In the first section of this paper several aspects of tardive dyskinesia (TD) (clinical, epidemiological, pharmacological) are reviewed. We propose that this syndrome is not the consequence of dopamine receptor proliferation, but results from damage or degeneration of striatal cholinergic interneurons. We suggest that this cellular damage is caused by prolonged overactivation of these neurons, which occurs when they are released from dopaminergic inhibition following neuroleptic administration.**

Brain cells die and are damaged by these psychotropics.

**4) Psychiatric research in the 21st Century; Opportunities and Limitations, GR, Heninger, Millenium Article, Molecular Psychiatry (1999) 4, 429-436**

The above is a report which points out that psychiatric "research" will be based in Neurology, psychiatry may start becoming scientific, with the intent NOT to cause brain damage, and they mention neurotrophins several times. Neurotrophins are associated with nerve protection and nerve growth, unlike the entire spectrum of psychotropics on the market today, with the exception of Lithium, which is not a drug, but is neuroprotective.

Lithium only costs approximately 15 US dollars per month, and which is why it is not prescribed very often. It can't be patented, it is not a drug, it is extremely inexpensive, it is also neuroprotective and treats many so-called psychiatric disorders - probably because it is neuroprotective, and protects brain cells from demise from many mechanisms, including infection and stroke.

**5) "Akathisia and Exacerbation of Psychopathology; A Preliminary Report", Dunca, et al. Clinical Neuropharmacology, Vol 23, No. 3, pp. 169-173** Department of Psychiatry, New York University School of Medicine, New York, USA.

6) **"Akathisia has previously been reported to exacerbate psychopathology and to be associated with noncompliance, suicidality, and violence. "**

This means drug-induced brain damaged makes people more deranged, agitated and violent, in addition to more physically miserable as a result of psychotropics-induced brain damage, as do the next two listed here:

**7) "Subjective Emotional Experience and Cognitive Impairment in Drug-Induced Akathisia", Jong-Hoon Kim, et al, Comprehensive Psychiatry, Vol.43, No. 6 (November/DEcember), 2002: pp 456-462**

**8) "Correlations Between Akathisia and Residual Psychopathology: A By-product of Neuroleptic-Induced Dysphoria", Newcomer, et al. Br J Psychiatry. 1994 Jun;164(6):834-8.**

Among the other data submitted to Laura Lustig November 20, 2003 was the following abstract and full text article:

**9) Neuroleptic-induced akathisia and violence: a review.** Center for Forensic Services, Western State Hospital, Tacoma, WA 98498-7213, USA. leonggb@dshs.wa.gov

**"Surprisingly, the association of neuroleptic-induced akathisia and aggressive behavior was not formally recognized until nearly two and one-half decades of antipsychotic prescribing had passed. Using a search of the anglophonic literature, this phenomenon is reviewed. Advances in psychopharmacology have reduced neuroleptic-induced akathisia and hold promise to eliminate it altogether. Nonetheless, important clinical and forensic aspects of neuroleptic-induced akathisia and aggression remain and are explored."**

PMID: 12570226 [PubMed - indexed for MEDLINE]

In the body of the report is the following statement:

**"Although there is an optimistic picture for the possible extinction of NIA associated violence, we do not anticipate that this will happen in the next few years. As such, there remains the spector of neuroleptic-associated aggression as a relevant factor when considering a criminal defendant's mental state at the time of an alleged crime."**

Pfizer has published the following article on how to treat antidepressants-induced akathisia (agitation), which they simultaneously deny exists:

10) **SSRI-induced extrapyramidal side-effects and akathisia: implications for treatment.**
Pfizer Inc., New York, NY 10017, USA. laner@pfizer.com

**The selective serotonin reuptake inhibitors (SSRIs) may occasionally induce extrapyramidal side-effects (EPS) and/or akathisia.This may be a consequence of serotonergically-mediated inhibition of the dopaminergic system. Manifestations of these effects in patients may depend on predisposing factors such as the presence of psychomotor disturbance, a previous history of drug-induced akathisia and/or EPS, concurrent antidopaminergic and/or serotonergic therapy, recent monoamine oxidase inhibitor discontinuation, comorbid Parkinson's disease and possibly deficient cytochrome P450 (CYP) isoenzyme status. There is increasing awareness that there may be a distinct form of melancholic or endogenous depression with neurobiological underpinnings similar to those of disorders of the basal ganglia such as Parkinson's disease. Thus, it is not surprising that some individuals with depressive disorders appear to be susceptible to developing drug-induced EPS and/or akathisia. In addition, the propensity for the SSRIs to induce these effects in individual patients may vary within the drug class depending, for example, on their selectivity for serotonin relative to other monoamines, affinity for the 5-HT2C receptor, pharmacokinetic drug interaction potential with concomitantly administered neuroleptics and potential for accumulation due to a long half-life. The relative risk of EPS and akathisia associated with SSRIs have yet to be clearly established. The potential risks may be reduced by avoiding rapid and unnecessary dose titration. Furthermore, early recognition and appropriate management of EPS and/or akathisia is required to prevent the impact of these effects on patient compliance and subjective well-being. It is important that the rare occurrence of EPS in patients receiving SSRIs does not preclude their use in Parkinson's disease where their potentially significant role requires more systematic evaluation.**
**PMID: 9694033 [PubMed - indexed for MEDLINE]**

**STATUS**

The State of Connecticut has long been in possession of this data and this science, which shows that nearly all, if not all, psychotropics are brain damaging. This data was also on Plaintiff Dickson's website www.ACTIONLYME.com , from the summer of 2003 until December 23, 2004, when the former John Rowland pleaded guilty to his crimes related to an alleged prison-building enterprise. The alleged criminal enterprise, which was allowed to operate from John Rowland's office, involved DCF's former commissioner Kristine Ragaglia, and which involved the CT prison children, CJTS, which will close and not be used as a prison at all.

The State of Connecticut is therefore liable for any violent deaths or violence associated with any medications they have prescribed for their victims, especially children, and especially children who have

killed themselves in DCF's "care," if the DCF has insisted they take these brain-damaging psychotropics, when they knew better, and have known of these factual scientific details since **<u>11-20-03.</u>**

The State of CT in no way is competent to brain matters, matters of trauma, matters of children, matters of health, matters of epidemics, and matters of basic human civil rights, despite being given the evidence by the Plaintiff Dickson, and despite laws regulating the behavior of ***all*** citizens, not exclusively persons who are not employed by the State or federal government.

The First Amendment:

> *"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."*

When the plaintiff Dickson tried to redress grievances and express free speech, and under no violation of law, was falsely charged with harassing communications and threatening and was not allowed access to the courts. This is an abuse of power, as is the case of John M. and his family. John M. is entitled to no assistance in defense, according to the State of Connecticut; his family is not allowed to know the specific details of his charges; he has been long-declared incompetent; no evidence of a competency evaluation having been performed has been granted to his family subsequent to his arrest; and the DMR stated that John M. refused involvement of the DMR, yet the family refutes that claim.

The State of CT is incompetent to all brain matters, as demonstrated above and in a previous motion dated Aug 3, 2005, and in the original complaint under this docket number, and therefore can pass no criminal judgment on this person, John M., who has been effectively declared a non-person.

Plaintiff KM Dickson should not have to be filing a complaint in the federal district of Rhode Island about the incompetence of the entire State of CT on all brain matters: Autism, Lyme borreliosis, mental

retardation, well-known neuropsychiatric diseases such as Alzheimers's, Multiple Sclerosis, Lupus, and should not have to explain to CT what is in the drug monographs for such common psychotropics as risperidone, since it would be inherent in the commissions of the various departments of the State to act in the best interests of the State, and the State is its residents.

John M. has been declared competent but was formerly "developmentally" incompetent, has been incarcerated 6 months on a class 4 misdemeanor, is considered a ward of the State, but is in a jail instead of a group home or some other housing which should be provided by the State for all persons who are mentally incompetent or meet the criteria of a non-recoverable neuropsychiatric disease. Ms. Hoggan and Ms. Andino should not be in prisons. Plaintiff has heard from others and read in the newspapers that prisons are being used to warehouse the mentally ill, but also clearly now, prisons are being used to warehouse chronically ill people and people with mental retardation.

There is no entity in the State to qualify any person's mental status as demonstrated in all of the above examples. The State of Connecticut, rather than accept the liability of the science that demonstrates that all psychotropics are brain damaging, kidnapped Plaintiff Dickson's children, and falsely criminally charged plaintiff Dickson with the insanity invented for her at her DCF "trial," and which is a product of AAG Jessica Gauvin's pathological imagination and is the perjury of James Phillips, Kenneth Marcus, and others.

**ABUSE AND NEGLECT AS POLICY- THE 10-FOLD INCREASES**

These are gross, across the board, abuses and misuse of all state agencies and departments to effect an end to civil rights in Connecticut, because there is little no other real work, and there is no money in the State budget to provide for people who really need it, while the DCF's budget increased 266%. Thus, the unions of State employees acted to form the government in their own interest, rather than the people the State employees serve. The State prosecutor's office and the DCF spend all of their time conspiring to

put people away who are a nuisance and ruining their lives, regardless of whether their victims can help being a nuisance or not. This policy formally started in 1995, as soon as Governor John Rowland took office as can be seen in the announcement which is executive Order Number Two:

**WHEREAS, the taxpayers of Connecticut deserve a state welfare system that is sound and secure from fraud and abuse; and**

**WHEREAS, the beneficiaries of our state welfare system deserve a method of assistance that can truly help lift them out of poverty, not keep them there; and**

**WHEREAS, State Superior Court Judge Arthur L. Spada conducted a State Grand Jury investigation that uncovered wide-spread welfare fraud and abuse facilitating an insidious link between our current welfare system and the illicit drug trade; and**

**WHEREAS, Judge Spada's report contained findings and recommendations that must be given serious attention if the current abuse of our welfare system is to end.**

This "policy" resulted in nearly 10 times the number of inmates in the York women's prison since 1994, according to a reliable source inside the prison, who is also a Republican. DCF's budget grew, as previously mentioned in the original complaint, from $227.6 million in 1994 to $606.1 million in 2004. This a 266% increase and not a 165% increase:

*1. Growth in DCF's Budget Has Far Exceeded Growth in DCF's caseload*

> ***In the last decade, the number of children served by DCF increased from 7,500 children at the end of FY 94 to 12,247 children at the end of FY 04 (a 63% increase). DCF's General Fund budget grew faster- from $227.6 million in FY 94 to 606.1 million in FY 04 (a 165% increase), With DCF's revised SFY 05 General Fund budget at $642.6 million, there has been a 182% nominal increase since FY 94. While some of this growth is attributed to the more complex clinical needs of children now in care and to long overdue investments to improve the quality of care of these children, much growth is also due to skewed spending policies that skimp funding for services that could reduce child welfare involvement while, at the same time, increasing spending for "back end" placements and services."***

There was also a 445% increase in children taken from their parents during this time period, while, as Rowland claimed, there was a 45% reduction of "abuse." A 10 fold increase in families wrecked, and a 10 fold increase in incarcerated women, seems to be the result of this Arthur Spada policy of racism and

*criminalizing* poverty. This appears to be the same thinking as former Massachusetts Governor William Weld. Cut welfare. Weld wanted to "reintroduce prisoners to the joys of busting rocks."

Reported in the August 20th, 2005 edition of the New York Daily News, Weld is : **A fiscal conservative who cut taxes and curbed welfare in Massachusetts...."** This sounds scarily like John Rowland's policies, which did not result in the reduction in the size of the government, but merely was a platform for the friends of these Republicans to establish a federal funding feeding trough, at the expense of human lives. This can't have been the intention of the US Constitution, Declaration of Independence, and Bill of Rights, and so it is laughable that the United States would want to violently bring this sort of "freedom" to other countries, especially when the United States is bankrupt and their allegedly human rights abusing opponents are sitting on the second largest world oil reserves.

On a more local level, most of the cases mentioned in this entire combined complaint give the appearance that the liabilities lie elsewhere, yet the sick, innocent or incompetent victim was blamed. Just as it is well-known that the DCF can be used as a weapon, and that the DCF staff are extremely ignorant, so too, does it appear that the liabilities for the nursing home crimes, and the non-crimes of the retarded were shifted by people who knew how to abuse the ignorance of the police. The prosecutors are only after simple cases they can win and have no incentive to tangle with people who have the money to present the challenge of a difficult trial, as would be the case with the nursing home owners.

In the case of the mentally retarded, who all will eventually be wards of the State, the State obviously has a policy of the cheapest solution. They simply declared a clearly incompetent man to be competent so that he could be prosecuted as a criminal (John M.).

Steven Erickson and Christopher Kennedy and other like them who suggested a way to effect fairness is to have citizen oversight of the police, were clearly persecuted. Both are very intelligent men. Not so the police, from Plaintiff Dickson's local police experience. Naturally such people, such as the police, feel

threatened by people who are more educated than they are, especially if the police and DCF staff are involved in drug-related crime, and other crime, which clearly some are. John Rowland also helped himself to State goodies, but blamed his son. What Rowland did was not considered burglary, but if he was black and not the governor, it most certainly would have been considered burglary. This appears to be true also of the present governor's son, if the report in Corporate Crime Reporter was true about the stolen skidoos.

In the case of people who have Lyme disease, it was much more convenient to prosecute the Plaintiff, and destroy her family, than for the truly guilty, in this case, Nancy Martin, Carolyn Martin, Donald Dickson, the State of Connecticut, the DCF, Yale University and James Phillips, to be prosecuted. Plaintiff Dickson represented a threat to DCF, DMHAS, Yale, the State Health Department, and the criminal justice system simply for revealing that evidence is evidence and that hearsay is hearsay. This would clearly upset the entire State and federal justice system and put a lot of mental health "experts" out of business, not to mention the effect on the pharmaceutical industry.

**THE REALITY OF FORENSIC PSYCHIATRY**

Psychiatric "expertise" is in no way evidence or expertise. Psychotropics contribute to violence and dementia, mitigating every single case where a person who had been taking psychotropics committed a violent or demented act. Forensic science actually points to the prescriber of these drugs, and the reality of what is "forensic psychiatry," is completely different from what everyone thinks.

Such a revelation, psychiatry fights very hard to suppress. They also would like the world not to know that psychiatry is not a medical practice, except in cases where psychiatrists try every available method to discover if there is actually something medically, or mechanically wrong with a person's brain. They rarely do. Forensic Psychiatrists even more rarely do so before offering a paid opinion. We should never expect to see a Forensic Psychiatrist testify that in a child who commits a violent act, but who also had

been taking psychotropics, was at least doubly mitigated. This is from the members of the "helping" profession.

James Phillips had said to Plaintiff Dickson in December 2002, after trying 10 different drugs, some of which increased agitation and made Plaintiff Dickson's neurological disease worse, **"I think you need to be on medication, I just don't know what kind."** Plaintiff Dickson had first asked for ProVigil for alertness before the subsequent 10 or 11 drug experiment, none of which were ProVigil. This is obvious medical malpractice since Lyme borreliosis results in a delirium and Plaintiff Dickson has this objectively documented delirium as demonstrated in the reduced blood flow to the brain as shown in a brain SPECT scan.

In the case of John M., we would all like to know who determined John M. was competent because that person should be behind bars.

Therefore, there are a lot of innocent people in prisons, since blaming the victim and selectively prosecuting "crime" is an yet another unique Connecticut epidemic. The founders of this country thought we should have God-given human rights-based laws, and constitution, and bill of rights intended to prevent the abuses of an autocracy.

Exhibits RR and SS, now entered as evidence in this complaint are these November 16 and November 20, 2003 databinders, respectively. Mr. Blumenthal has access to the Nov 16 and Nov 20, 2003 databinders. Mr. Blumenthal was sent the 11-16-03 databinder. The 11-16-03 databinders were mentioned in the "Temporary Order of Custody" (TOC) written by Yale's and DCF's Patricia Leebens, but were not described to the court as what they were, and proving that she defrauded the court in her "TOC." Both databinders were left with Laura Lustig on Nov 20, 2003. Lustig had a contract to train DCF social

workers. Mr Blumenthal also has access to the audiotape of Mark Klempner's July 2001 RI Conference since the Plaintiff mailed it to his staff (AAG Thomas Ryan) approximately two years go (Exhibit OO).

Jeanne Milstein, the Child Advocate was mailed the **November 20, 2003** databinders on May 6, 2004.

**CERTIFICATION**

**This document and the evidence was sent by certified mail on August 22, 2005 to:**

**Connecticut Attorney General Richard Blumenthal**
**55 Elm Street**
**Hartford, CT 063106**

**It is certified that the Defendant does not need another copy of this evidence: RR, SS and OO.**

22 Aug-05

Kathleen M. Dickson

**Plaintiff's Kathleen M. Dickson, et al**
**23 Garden Street**
**Pawcatuck, CT 06379**