Social Security Administration

Internal Revenue Service

United States Department of Justice

31-Jan-06

http://actionLyme.org

faxed 31 Jan & 01 Feb-06 KMD

See pages 5-7 especially

Dear Sirs & Madams—

As you can see, the Connecticut Department of Children & Families has defrauded the federal government over their Temporary Aid to Needy Families (TANF funds) to the tune of 88 million dollars in one year alone (2003).

All I asked for was a baby-sitter for when I was extra-sick from Lyme disease. So DCF kidnapped my kids, and threw me in jail, charging me with being a terrorist.

Kathleen M. Dickson

CONNECTICUT
VOICES
FOR CHILDREN



# Careening Toward Crisis: State and Federal Funding of Child Welfare Services in Connecticut
## *Executive Summary*

by Shelley Geballe, JD, MPH & Judith Solomon, JD

December 2004

The State of Connecticut has a legal and moral responsibility to ensure the health, safety, education, and sound development of all children and youth placed into its care and custody because of parental abuse or neglect. When the Department of Children and Families (DCF) fails in this duty, it compounds the harm already done to these children.

This report, the first in a two-part series, examines how state and federal funding is used *now* in DCF's budget to meet that responsibility, and how that funding has changed over time. The report finds that perverse federal funding incentives, coupled with some imprudent past state budget choices, is causing DCF and the children and families it is to serve to careen toward crisis in two significant ways:

- Connecticut's budget now invests far too little in the home and community-based services that can prevent child abuse and neglect in the first instance, and then avert out-of-home placements if a child is referred to DCF. Instead, families are helped primarily after crises erupt, children are harmed, and the problems have become more difficult and costly to address.

- Once children are in DCF's care, Connecticut's spending remains skewed, with a diminishing share of all funding allocated for the programs and services that could maintain children in family-like settings, and an increasing share of funds being spent on more costly and restrictive institutional out-of-home care.

This report concludes that past state budget choices, coupled with illogical restrictions placed on the use of federal child welfare funding under Title IV-E of the Social Security Act, actually have undermined the development of a system of child welfare services that meets all requirements of federal and state law and serves the best interests of children.

While there have been some recent, and very important, efforts to reverse some of these funding patterns (e.g., the development of KidCare, increased funding for Nurturing Families), concurrent state budget choices have actually accelerated the trends (e.g., increased reliance on TANF funds in DCF's budget). As a result, there remains a very serious mismatch between the goals of a well-functioning child welfare system (as specified in state and federal law) and current state and federal financing of that system. It will take a fundamental re-structuring of how state and federal child welfare-related funds are used to prevent continuing increases in DCF's caseload and budget.

New Haven Office: 33 Whitney Ave. • New Haven CT 06510 • Phone: 203.498.4240 • Fax: 203.498.4242 | Web Site: www.ctkidslink.org
Hartford Office: 60 Gillett St. Suite 204 • Hartford CT 06105 • Phone: 860.548.1661 • Fax: 860.548.1783 | E-mail: voices@ctkidslink.org

Docket 3:05 (CV) -91 (CFD)
30-May-05 KmDickson

## Key Findings

### 1. Growth in DCF's Budget Has Far Exceeded Growth in DCF's Caseload

In the last decade, the number of children served by DCF increased from 7,500 children at the end of FY 94 to 12,247 children at the end of FY 04 (a 63% increase). DCF's General Fund budget grew faster -- from $227.6 million in FY 94 to $604.1 million in FY 04 (a 165% increase). With DCF's revised SFY 05 General Fund budget at $642.6 million, there has been a 182% nominal increase since FY 94. While some of this growth can be attributed to the more complex clinical needs of children now in care and to long overdue investments to improve the quality of DCF's care for these children, much growth also is due to skewed spending choices that skimp on funding for services that could reduce child welfare involvement while, at the same time, increasing spending for expensive "back end" placements and services.

### 2. DCF's Spending on Out-of-Home Placements Has Far Exceeded Growth in Its Spending on the Programs and Services That Could Help Avert Such Placements

*Out-of-home care.* As Chart 1, below, chart illustrates, over the past decade DCF's investments in the home and community-based services that could help prevent child abuse and neglect and avert out-of-home placements have been anemic, while spending on expensive out-of-home care has soared.

*Residential treatment.* In addition, as Chart 1 further illustrates, DCF's growth in spending on expensive residential treatment has far outstripped growth in spending for less expensive and more family-like foster care and therapeutic foster care placements. Moreover, the growth in DCF's spending for residential treatment (a 218% increase between FY 94 and FY 04) is nine times greater than the growth in the number of children and youth placed in residential treatment (a 24% increase over this period).



*In-patient psychiatric hospitalizations.* Spending growth also has been rapid for in-patient psychiatric hospitalizations. A significant portion of this growth can be attributed to "gridlock" in Connecticut's children's mental health system. Connecticut's failure to invest adequately in a robust continuum of home and community-based services has resulted in children in DCF care and custody languishing in costly psychiatric hospital settings past the time for discharge. Connecticut's "reinsurance" program is the cause of much of this acceleration in spending.

Specifically, soon after children in the care of DCF were enrolled in the Medicaid managed care program, issues arose concerning discharge of children from psychiatric hospitals. The Medicaid managed care organizations often determined that a child was no longer in need of inpatient treatment, but DCF had no appropriate placement to which the child could be moved. Since September 1998, this discharge issue has been addressed through reinsurance. The Connecticut Department of Social Services (DSS) reimburses the managed care plans for in-patient psychiatric hospital care after a certain length of stay. Under the current contract between the health plans and DSS, the health plans are fully responsible for the first fifteen days of care at both the acute and sub-acute levels. However, from day 16 to day 45, the state assumes 75% of the cost of care; from day 46 to day 60, the state pays 90%; and after 60 days, the state is fully responsible for paying for the care that is provided to the child.

This reinsurance program has become extremely costly. In 2002, DSS made over $23 million in reinsurance payments to the managed care organizations (*nearly half* – 46% -- of the health plans' total behavioral health spending). Importantly, these payments were ***in addition to*** the monthly capitation payments DSS already had paid the health plans to provide *all* needed behavioral health care to enrolled children. During just the first six months of 2003, reinsurance payments to the health plans totaled over $12 million (the same amount that had been projected for *all* of 2000).

### 3. Multiple State Factors Contribute to Increased "Back End" Funding at DCF

A number of factors -- *other than* the clinical needs of the children and youth in DCF care –contribute to Connecticut's increased spending at the "back end" – for in-patient psychiatric care, residential treatment, and foster care. They include:

o *Lack of a comprehensive continuum of home and community-based services, resulting in DCF relying more than may be clinically-necessary on more restrictive out-of-home placements that also are far more costly.* As illustrated in the following chart, the annual cost for a child to stay in an in-patient facility or a residential treatment program far exceeds the annual cost of the comprehensive home and community-based services that can prevent child abuse or neglect or, if such maltreatment occurs, might allow a child either to remain at home or be placed in a less restrictive, more family-like placement. For example, for the average cost of maintaining a child at DCF's Riverview Hospital for a year ($492,000/child), DCF could provide in-home therapy services to 65 children for a year ($7,500/child).

| A Sampling of Costs of State-Funded Programs and Services | |
|---|---|
| | Cost Per Year, Per Bed/Child |
| DCF-Riverview Hospital | $492,020 |
| DCF-High Meadows | $456,615 |
| DCF-CT Children's Place | $339,450 |

| | |
|---|---|
| DCF-CT Juvenile Training School | $325,215 |
| DCF-Funded Private Residential Treatment | |
| High: Wellspring | $123,560 |
| Stonington Institute | $112,610 |
| Low: APT Foundation/Alpha House | $40,898 |
| New Hope Manor | $38,504 |
| | |
| After-School Extended Day Treatment | $32,000 |
| Special Needs Day Care | $31,200 |
| Head Start with Parent Partnering | $10,630 |
| Intensive Case Management | $9,600 |
| Intensive In-Home Child & Family Therapy | $7,500 |
| Multi-Systemic Therapy | $6,800 |
| Home Visiting for At-Risk Children (by nurses) | $6,200 |
| Medication and Monitoring | $6,000 |
| Home Visiting for At-Risk Children (by trained paraprofessionals) | $3,200 |
| Supportive Case Management | $3,200 |
| | |
| Average Cash Assistance Grant under Temporary Family Assistance | $6,500/yr for a family of 3 (2004) |
| Sources: *Letter from Office of the State Comptroller to Commissioner of Department of Administrative Services* (July 17, 2003)[DCF facility per capita costs, as of July, 2003]; Office of the Child Advocate & Attorney General of Connecticut, *The Cost of Failure* (2003), pp. 18-21 [other cost data]. | |

Importantly, Connecticut squandered an important opportunity in the late 1990s to build a comprehensive continuum of home and community-based services using General Fund surplus funds.[1] Had Connecticut built "front-end" capacity in these years, it would now be far easier to keep children and youth with their families, and out of more restrictive and expensive settings.

o *Differences in state funding formulas.* State law guarantees Connecticut's private residential treatment facilities a cost-based rate of reimbursement; DCF's rate of reimbursement to the facilities increases as their costs of operation increase. By comparison, there is no cost-based reimbursement for home- and community-based services (such as child guidance clinics, family preservation services, and family support programs). Indeed, these programs have not consistently received cost of living increases.

o *Connecticut's costly reinsurance program undermines efforts to provide appropriate community-based services to children and reduces access to in-patient hospitalization for DCF children in psychiatric crisis.* The fact that Connecticut is now spending tens of millions of dollars on reinsurance – i.e., essentially paying managed care plans *twice* for behavioral health care – means there is less funding available for the home

[1] Like the time when the polio vaccine was developed and governments found themselves briefly paying both for the costs of the vaccine to prevent future cases and also the costs of care for those who had polio, some period of "double" funding is necessary to build capacity among providers of home and community-based services before Connecticut children can be moved out of residential and in-patient care into less restrictive placements. Connecticut elected *not* to make this "double" investment when the state had large budget surpluses, preferring to reduce taxes. A notable exception was the Community Mental Health Strategic Investment Fund that used state surplus funds to seed innovative pilot initiatives to reduce gridlock and improve services in Connecticut's adult and children's mental health systems.

and community-based services that would address the underlying problem of gridlock in the system. With substantial state funding going toward this clinically-unnecessary care, funding to develop more appropriate placements and services is lacking.

In addition, while the current reinsurance system absolves the managed care organizations and the mental health care providers of having to pay for care at a level of acuity that is no longer needed, it also removes any incentives that the health plans and hospitals previously had to find community-based placements for children no longer in need of in-patient hospitalization. Instead, children linger in the hospital longer than is clinically necessary, occupying beds that then are not available to other children who urgently need in-patient psychiatric hospitalization.

**4. Connecticut's Current Use of Federal Funds Contributes to DCF's Increasing Caseload and Soaring Budget.** Over the past 70 years, the federal government's involvement in child welfare has expanded primarily through enactment of various funding initiatives. Congress would appropriate funds for specific child welfare-related purposes and condition states' receipt of these funds on compliance with the specified requirements set out in the federal enabling legislation.

As discussed in detail in this report, DCF's projected $658 million budget for FFY 05 includes federal funds[2] from a variety of sources: a) Title IV-B of the Social Security Act ($5.1 million); b) the Child Abuse Prevention and Treatment Act ($0.3 million); c) the Chafee Foster Care Independence Program ($2 million); and d) various other smaller federal grant programs ($3 million). It also includes $118 million in funds from the TANF block grant, as well as $174.4 million in funds appropriated and claimed under Title IV-E of the Social Security Act and $21.9 million appropriated and claimed under Medicaid. In addition to these child welfare-related federal funds, Connecticut receives significant reimbursements under Medicaid for health care spending on the vast majority of children in DCF care; in March, 2004, 72% of the children in DCF care were Medicaid-eligible.

There are two primary ways in which Connecticut's current use of federal funds contributes to DCF's increasing caseload and its soaring budget:

- *"Mis-allocations"* -- by diverting significant amounts of federal funds intended to stabilize families and divert children from foster care to uses that are not wholly consistent with these purposes, resulting in families having to be in crisis before Connecticut provides help.
- *"Missed opportunities"* -- by failing to be more creative and aggressive in claiming federal reimbursements to which Connecticut has a right (or option) under Medicaid and Title IV-E.

By addressing both issues, Connecticut could re-structure its child welfare financing to better control caseload and budget growth, and also serve children and families more effectively.

---

[2] The manner in which Connecticut presents its budget fails to reflect, on its face, this full federal contribution. Connecticut *gross* budgets, i.e., it appropriates both state and also anticipated federal reimbursements through its General Fund budget. It then counts federal reimbursements when received (e.g., under Medicaid, Title IV-E) as General Fund revenues. For example, a significant portion of the $149.3 million General Fund appropriation for residential board and care in DCF's budget includes anticipated federal reimbursements under Title IV-E of the Social Security Act (50% reimbursement for the costs for IV-E eligible children in residential treatment). In March 2004, nearly 53% of the children in DCF out-of-home care were determined to be Title IV-E eligible.

*Diversion of federal "front-end" funds.* As this report discusses in more detail, DCF's budget increasingly relies on federal funds that primarily are intended to *avert* families' involvement with child protective services. The following two examples illustrate this point:

- *Diversion of Title IV-B Funds to Fund DCF Staff.* By federal law, Title IV-B, subpart 1 funds are to be used for services to prevent child abuse and neglect, reduce foster care placements, reunite families, arrange adoption, and ensure adequate foster care. To assure that states focus *most* of these funds on services to *prevent* out-of-home placements, federal law limits the amount of these funds that can be used for other purposes. Despite the fact that Title IV-B, subpart 1 funds are already a small amount (and declining) source of very limited amounts of flexible federal funding that is targeted to preventive services, DCF uses these funds primarily for salaries for DCF staff at the Connecticut Children's Place (formerly the State Receiving Home) and also for three staff positions located in area offices, *not* to prevent children's DCF involvement and out-of-home placement.

- *Diversion of TANF Block Grant Funds to Fund DCF staff.* Like Title IV-B, federal funds in the Temporary Assistance for Needy Families (TANF) block grant are intended to fund "front end" services: a) to provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives; b) to end the dependence of needy parents on government benefits by promoting job preparation, work and marriage; c) to prevent and reduce the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and d) to encourage the formation and maintenance of two-parent families.

Prior to FFY 1999, no more than $16 million of TANF funds were included in DCF's budget in any year (and in some years, *no* such funds were used). However, since 2001 this has markedly changed, as illustrated in the chart below.

In FFY 05, $118 million of DCF's budget -- one in five of all dollars – is to come from TANF. Further, more than four in ten of all TANF dollars (41%) will be spent on DCF programs and services.



The relationship between the current uses of the majority of these TANF funds in DCF's budget and the federally-authorized uses of TANF funds is fairly attenuated. In FFY 03 (when $113.7 million of TANF funds were in DCF's budget), three-quarters of the TANF funds were spent either for DCF case management services ($61 million) or DCF investigations ($27 million in FFY 03). By comparison, far smaller amounts of TANF funds were used for services to prevent child abuse and neglect and support families so children would not need to come into DCF care, e.g., $4.1 million for treatment and prevention of child abuse, $2.5 million for early childhood development, $4.6 million for family preservation, and $3.7 million for intensive in-home services.

88 million

The clear – and troubling -- trend is for an increasing proportion of TANF funds to be diverted to DCF to pay its staffing costs rather than being used to fund programs and services that help families on welfare and in low-wage jobs achieve economic self-sufficiency. A likely consequence of this shift is that children living in families unable to meet their basic needs are referred to DCF for services. That is, it is increasingly likely that families will receive help only when they reach crisis and reports of child neglect or abuse are made. In addition, core functions of our child welfare system will become increasingly vulnerable to cuts in federal TANF funding, since an increasing share of DCF budget is being funded with TANF funds.

*Missed Opportunities to Claim Federal Reimbursement.* Connecticut has failed to maximize federal reimbursements for a variety of services provided to DCF-involved children and youth. As a result, there is less total funding to meet current needs and – importantly – also less funding to make the initial investments necessary to develop the robust continuum of home and community-based services that can avert, or reduce the duration of, many out-of-home placements.

As this report identifies, and as the second part of this two-part report will discuss in much greater detail, these missed opportunities include:

- *Failing to Make More DCF Children Eligible for Medicaid.* To meet the DCF's obligation to provide necessary health care services to all children in its care, children are enrolled in HUSKY A, Connecticut's Medicaid managed care program. For nearly three-quarters of the children in DCF's care and custody, these health benefits are federally-subsidized through Medicaid (Connecticut receives 50% reimbursement). In March 2004, for example, 72% of the children in DCF care were eligible for federally-funded Medicaid (8,464 DCF-related children out of 11,760). For children not eligible for federally-funded Medicaid, Connecticut provides *state-funded* HUSKY A coverage and DSS does *not* receive federal reimbursement for the cost of the services these children receive. As of March 2004, 3,296 DCF children were in state-funded HUSKY (about 28% of all DCF children).

Importantly, most of the DCF children in state-funded HUSKY are *not* disqualified from federally-funded benefits because of their immigration status[3] or their placement in certain state institutions (such as detention centers), but because DCF fails to make application on their behalf in a timely fashion to determine their eligibility for federally funded benefits,[4] or because they had turned 18 years

[3] In general, federally funded Medicaid benefits are not available for most legal immigrants who have been in the country less than five years and for any undocumented immigrants.

[4] While Medicaid allows retroactive reimbursement (for up to three months from date of application) for care provided to a child determined to be Medicaid-eligible, delays in filing applications for Medicaid (or failure to file applications at all) can result in reduced reimbursements.

of age. Almost all these children *could be* provided with federally funded Medicaid benefits through fairly simple changes in policy and procedures.

For example, when a child first comes into the care of DCF, the child receives state-funded benefits while eligibility for federally funded Medicaid coverage is being determined.[5] Because the vast majority of children in DCF care are eligible for Medicaid, policies and procedures that assure timely application and speedy eligibility determinations would increase federal reimbursement to the state. Two ways to accomplish this are: a) to station a DSS worker at DCF to determine accept applications and eligibility; and b) to designate DCF a "qualified entity" able to provide immediate, temporary Medicaid eligibility to children entering DCF care.

In addition, currently *state*-funded HUSKY benefits are provided to the young adults who remain in DCF care past their 18th birthday under its Independent Living program who have income or resources that exceed the very low eligibility levels that would make them otherwise eligible for Medicaid. However, these youth *could* be eligible for federally funded Medicaid under the Foster Care Independence Act of 1999. This Act established a Medicaid option that would allow Connecticut to provide Medicaid coverage to *all* children in foster care on their 18th birthday until they reach the age of 21. By taking advantage of this federal option, Connecticut could receive federal reimbursement for the currently state-funded HUSKY A benefits provided to almost all of the young adults between 18 and 21 who are currently in DCF care and custody. In addition, young adults who leave foster care at age 18 *or any time before they turn 21* could also receive federally-subsidized HUSKY A coverage through this pathway to eligibility.

- *Failing to Fully Claim Medicaid Reimbursement for Covered and Optional Services.* Since at least 1989, consultants have advised Connecticut regarding ways in which federal reimbursements through Medicaid and Title IV-E for child welfare-related services could be enhanced.[6] Recommended "re-financing" ideas have included:

  a) Medicaid targeted case management reimbursement for DCF's direct service and administrative costs;
  b) The Medicaid rehabilitative services option to cover community services for children and youth not currently reimbursed by Medicaid;
  c) The Medicaid private non-medical institution (PNMI) coverage for treatment components of residential care programs;
  d) Title IV-E reimbursement for training not only of DCF case managers, but also for case assessment, case planning, case management, and consumer family training associated with the development of local systems of care, and for broad training initiatives that include *all* public agencies concerned with high-risk children and families.

---

[5] DCF caseworkers provide information to a special unit at DCF that completes HUSKY applications for the children and mails them to the regional DSS offices. Once at DSS, the application can take up to 45 days and sometimes longer to be acted on.

[6] E.g., Connecticut Department of Children and Youth Services, *Refinancing and Expanding Services to Children Through a Controlled Use of Medicaid (Title XIX): A Proposal for the Consideration of the Department of Income Maintenance* (July 21, 1989); Maximus, *Children and Family Services Federal Reimbursement Options* (October 4, 1999); Connecticut Department of Social Services, *Delivering and Financing Children's Behavioral Health Services in Connecticut: A Report to the Connecticut General Assembly Pursuant to Public Act 99-279, Section 36* (February 2000).

While Connecticut now claims some federal reimbursement under PNMI for residential treatment, it has not taken full advantage of these ways to maximize federal revenues.

**5. Current Federal Funding Rules Under Title IV-E of the Social Security Act Contribute to DCF's Problems in Funding Child Welfare Services in a Manner That is Cost-Effective and Serves Children's Best Interests.**

Current restrictions placed on the use of federal funds for child welfare services also are impeding states' efforts to provide competent care. Not only is there a need for *increased* federal funding support, but also for increased *flexibility* in the use of child welfare funds.

As discussed more fully in the report, federal "front-end" funding for services targeted at preventing child abuse and neglect and averting out-of-home placements when maltreatment has occurred has grown slowly, if at all, over the last decade. The federal government contributes relatively little to states' efforts to keep children in their homes, or move them to permanency through such federal funding streams as Title IV-B and CAPTA. There is a need for *increased* federal funding for such services.

By comparison, federal funding under Title IV-E has grown far more significantly over the last decade. Here, there is a need for greater *flexibility* in the use of federal funds. Connecticut receives 50% reimbursement for the costs of a foster child's out-of-home care if the child is eligible for Title IV-E, but does ***not*** receive such reimbursement for the service costs associated with keeping a Title IV-E eligible child in his home (or returning the child to his home). As a result, the Title IV-E financing rules "reward" DCF for making out-of-home placements by providing matching federal funds. However, if DCF successfully averts a placement, or moves a child back home, it not only fails to receive federal matching funds for the services the child may then need in her home, but also *loses* the federal matching funds it had been provided when the child was in foster care.

In short, current federal funding requirements create a perverse incentive, making it more financially advantageous for states to place children out of home than to provide services to keep families together. As two child welfare experts note:

> The federal foster care program provides open-ended funding for the room and board of certain eligible children in foster care, but only very limited funding for the development of alternative services for abused and neglected children and their families, both before a child must be placed in foster care or after a child returns home following placement. As a result, out-of-home care is often the easiest option for workers besieged with large caseloads and few other resources. Moreover, because funding under the federal foster care program is generally restricted to room and board, it is often difficult to give even those children placed in foster care the services and treatment they need.[7]

As will be discussed more fully in the second report in this two-part series, there are a variety of alternatives being considered to address the problems created by the current federal funding "straitjacket." These include – most significantly – the recommendations of the Pew Commission on

---

[7] M. Allen & M. Bissell, "Safety and Stability for Foster Children: The Policy Context" in *Children, Families, and Foster Care* (The David and Lucile Packard Foundation, The Future of Children, 14(1), 2004), p. 63.

Foster Care.[8] This Commission (a national, nonpartisan panel funded by The Pew Charitable Trusts and composed of leading experts in child welfare) recommended, inter alia:

- Preserving Title IV-E federal foster care maintenance and adoption assistance as an entitlement and expanding it to *all* children, regardless of their birth families' income and including Indian children and children in the U.S. territories;

- Providing federal guardianship assistance through Title IV-E to all children who leave foster care to live with a permanent legal guardian when a court has explicitly determined that neither reunification nor adoption are feasible permanence options;

- Helping states build a range of services from prevention, to treatment, to post-permanence by: (1) creating a flexible, indexed Safe Children, Strong Families Grant from funds currently included in Title IV-B and the administration and training components of Title IV-E; and (2) allowing states to "reinvest" federal and state foster care dollars into other child welfare services if they safely reduce their use of foster care;

- Encouraging innovation by expanding and simplifying the federal waiver process and providing incentives to states that: (1) make and maintain improvements in their child welfare workforce; and (2) increase all forms of safe permanence; and

- Strengthening the current Child and Family Services Review process to increase states' accountability for improving outcomes for children.

## VI. In Sum: Careening Toward Crisis

State and federal spending on child welfare services *should* support the development of a system of services that furthers best practices in child welfare, meets all requirements of federal and state law, and serves the best interests of children and families. This includes working to ensure that children are maintained with family whenever possible, and are placed in the least restrictive, most family-like setting when this is not possible. Currently, that is not the case.

Federal funding constraints and state budget choices have resulted in a DCF budget that, in many respects, has been allocating its resources at cross-purposes to what is known to be best practice in child welfare. The second policy brief on this subject, to be released by Connecticut Voices for Children early in 2005, will examine ways to change this course -- through changes in state policy and different state budget choices, by taking advantage of existing options in and possible waivers to current federal law, and through changes to federal law.

[8] http://pewfostercare.org/

31 Jan 06

Fax Content:
3 page snapshot
of Life in Corrupticut
by Steve Erickson

Corrupticut -

No jobs here.

Just Hatred & the processing of people on Uncle Sam's tab.

DCF Rowlandgate bills: "Due to the increasing terminations of parental rights being approved by the courts..." and ... "due to the increase in federal spending requirements for eligibility for federal funding... ." (Kommissioner Ragaglia)

KmErickson http:actionlyme.org

January 27, 2006

To Governor M. Jodi Rell and to Whom It May Concern:

I invested 100's of thousands of dollars and years of my sweat and hard labor to fix up Connecticut rental houses I fixed up from a boarded up Condition in Stafford Springs, Connecticut. I couldn't make money in rents if there were teens and other non-tenants selling heroin and crack cocaine off my front yard and near my property, teens were drinking beer in lawn chairs and selling drugs off my front yard 24 hours a day, prostitutes would move into my apartments without my permission and the Connecticut State Police refused to do anything but threaten me with arrest or worse for complaining about crime and criminals, and my windows were being smashed and I was going without sleep. I went to State Senator Tony Guglielmo and former Rep. Mordasky regarding my concerns and proposed Civilian Oversight of Police. There was a conspiracy to set me up for prison and to be thrown out of Connecticut wrecking my life, my family unity, credit, retirement, and making me lose my small business of 22 years. Why won't any of you that are officials, stand up to the plate and help right a wrong that was due to out of control corruption in Connecticut?

Should proposing Civilian Oversight of Police and pissing off Arthur L. Spada, the former Police Commissioner of Connecticut State Police have caused me to be harassed by police, my false arrest, fixed bogus criminal trial, my false imprisonment, and the threat of more prison and arrests if I didn't pack up and leave Connecticut in an hour after I was placed on probation after serving time in prison for being a beating and mugging victim in my own Connecticut dark driveway???!!!

Selectman John Julian of Stafford told me to sell my property at a loss to one of his friends as I was told he was more 'important' and if I didn't sell it then to come back and see him as I was going to sell it at a loss, it was just a matter of when. What!!!???

That was probably ground zero for the State Police going after me to ruin me and run me off my property.

Ritt Goldstein proposed Civilian Oversight of Police and he later fled the official Connecticut abuse and corruption seeking asylum in Sweden.

Should Rich Murzin a former Hartford Police Detective's sons have been arrested and beaten for one son having witnessed a police illegal beating of a suspect, and then the former detective suffering a felony arrest in retaliation for complaining about the illegal arrests and beatings of his sons?

Should Phil Inkel be retaliated against for reporting the same criminal police behavior and not have his accusations that Connecticut Police put out a hit on him when he lodged complaints against police???!!!

Rich Murzin faced a felony arrest for going home for lunch a common police procedure in his department, for getting pay while not working.

Police Commissioner Arthur L. Spada was using paid drivers to take him out golfing while he was supposed to be working and Spada falsified records, demoted the highest ranking police woman for being a woman, and was a general little racist, thin skinned little pipsqueak criminal piece of crap unelected official?

I emailed Spada the day before I was to be sentenced by Judge Jonathan J. Kaplan for being found guilty of 'overreacting' to being beaten on my own property while I was being mugged, by having used pepper spray.

A lawyer can be put in prison and lose his/her law license for actually defending their client. Attorney Michael H. Agranoff seemed to aid the prosecution and prevented me from defending myself. This seems to be policy in Connecticut.

I asked Spada to remove the US Dept. of Justice Community Policing webpage called, "COPS," on community policing policies, citing the policies were not being followed, I indicated that I was sending hardcopy of the email to the USDOJ.

Kaplan freaked out on me the next day, screaming at me, asking who the hell I thought I was. It is illegal for police and a judge to conspire behind the scenes to sentencing or fixing the case of an accused. Everything that has happened before and after is ridiculous and beyond belief, so I 'marked' my case by having sent that email to Spada of the police, to view the reaction of Kaplan, a Judge.

Should Chris Kennedy have had his kids taken away, faced numerous arrests, a $500,000 bond, 30 years in prison for complaining about Judge Jonathan J. Kaplan and trying to expose Connecticut's corruption and flagrant abuse of hardworking Connecticut citizens that dare speak out about Connecticut Official abuse.

Should Don Christmas get arrested and face prison for having threatened to sue Connecticut Police for civil rights abuse and for having proposed Civilian Oversight of Police as I had.? Should a police officer's 16 year old prostitute girlfriend face no punishment for attacking Donny on his property, while Donny faced a year and a half in prison, no deals, for being slapped in the back of the head and yelled at by the Enfield Police Officer's prostitute 16 year old girlfriend?

Should Kathleen Dickson have been thrown in a mental hospital and prison and made to sign a paper to "not criticize the government" to silence her after she exposed Rowland administration era corruption?

Should victims of Connecticut corruption still suffer?

Two Connecticut State Troopers committed perjury to get me convicted. Troopers Amaral and Langlois under oath, said I never tried to make a complaint against Brian Caldwell a front teeth missing, drug using, violent alcoholic who admitted on the stand to threatening to kill me and demanding money after he jumped me on my property at night during a robbery attempt.

If there isn't still corruption being covered up and vocal citizens being retaliated against, why won't you do anything to help correct the past abuse which is still continuing?

I await action and consideration for myself and others that still suffer for having lived in Connecticut and speaking their minds and exposing the truth.

There are so many people that have come to me about their abuse in Connecticut, including police officers abused by their own, officials abused, military people abused returning from war, etc.

I wanted to join the ranks of the Vermont or Massachusetts State Police before having moved to Connecticut, investing in rental property. Those departments don't disrespect and abuse citizens based on their zip code, economic status, type of employment or lack thereof, or race, as is the case in Connecticut.

I have been a disaster relief worker in the aftermath of Katrina in Mississippi and Louisiana and met police officers from all over the country, I can't say that I met one that was disrespectful, not upstanding, nor from all that I saw day after day, seeing so much, did I once see a police officer do ANYTHING questionable or illegal.

I can't say the same thing for my observing officers in Connecticut, in as little as one day going by, that have no fear of oversight, nor punishment for retaliation, misconduct, being highly disrespectful and downright rude, and illegal behavior as unwritten Connecticut State Police policy.

It all can make sense after one realizes that Connecticut police and courts are all about revenue collection and criminal correction is just a sideline around the main task.

The population has stayed the same and so has growth, unlike almost all other states that are growing, that aren't as blatantly corrupt. In over a decade the amount of State officials being hired and revenue collected has gone up 25 to 30 percent, with no growth.

How can it be justified for State Government to be more and more of a pig, parasite on the people? When there is corruption and government growth out of control, good working people have to be targeted for their assets and cash to feed a revenue collection system out of control.

Connecticut gets money to take away children in federal tax dollars, whether the parents are good to their children or not. Connecticut gets federal dollars to lock up citizens guilty or not. Connecticut gets federal dollars to 'process' citizens for restraining orders and other 'processing'.

So, how much longer will Connecticut get away with defrauding federal taxpayers nationwide?

How long will taxpayers be taken offline, being ruined, whenever they speak out about the abuse in Connecticut, or try to propose laws to elected officials to correct the abuse? Should the IRS investigate Connecticut for ripping them off by taking federal taxpayers offline?

Should families and individuals continue to suffer because of the abundance of sociopaths in the DCF, Police, and Judiciary in Connecticut that have no oversight and quality control?

I'm posting this Fax to you on www.starkravingviking.blogspot.com

Thank you,

Steven G. Erickson
Fax 504-324-0585

We request a federal investigation into the Chief State's Attorney's Office & related Color of Law abuses.
31-January 2006

Kathleen M. Dickson
23 Garden St
Pawcatuck, CT 06379
860-599-5451
http://actionlyme.org

And here Yale University
has defrauded the
United States of America
over what is the
blood test definition
of "Lyme disease"

C:\Documents and Settings\Owner\My Documents\TUCKER_BLUMENTHAL_RELL_27_OCT_05.doc

27 Oct 2005

AAG John Tucker
860-808-5590
55 Elm, Hartford, 06106

**VALIDATION OF YALE'S LYME TEST**

Dear Mr. Tucker-

Please take this to your staff patent attorneys to confirm.

Verify independently that this is the text of the Yale patent US # 5, 618, 533

---

This means they have the ability to diagnose Lyme (borreliosis) accurately and early but they chose not to because they chose to make more money on a bogus vaccine instead.

The "CLAIM" of the patent, if you look at it, is a fragment of DNA code, which means no one can use this unless licensed by Yale- which means **they have a monopoly on testing** and they prefer we don't have it available to us.

Yale's own validation is written within the claim of this patent 5, 618,533 and is well-described.

UCONN's Henry Feder tested the OspA vaccine on children in Europe when he knew that would do them no good and in fact, was harmful. This vaccine never should have gone to human trials.

Yale has an early and accurate test for Lyme, but did not use it, when all agree that early treatment gives better patient results.

This is CT's disease.

We have children in CT.

Lyme borreliae can infect the brain and does in 2/3 of the cases (Dattwyler published data).

It kind of makes sense to detect Lyme as early as possible to prevent this infection from reaching the brain and causing brain damage to children.

The State's resistance to this concept is unforgivably incompetent, abusive, and technically is child abuse and medical neglect.

- --

# The Yale Flagellin Patent <u>Validation</u> is right in the text of the patent:

<u>http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=/netahtml/srchnum.htm&r=1&f=G&l=50&s1=5618533.WKU.&OS=PN/5618533&RS=PN/5618533</u>

"The sera we used for these studies were obtained from Lyme disease patients, most of whom were seen at the Lyme disease clinic of the Department of Rheumatology, Yale University School of Medicine. All patients

tested serologically positive on a standard ELISA test using whole sonicated B. burgdorferi as antigen. In FIG. 3, patients 5, 8, 16 and 17 had ECM. Patients 2, 4-8, and 10-11 had chronic arthritis of greater than 6 months duration, patient 14 had peripheral neuritis, patient 16 had Bell's Palsey, patient 17 had severe headache and patient 18 had encephalopathy. Patients 1, 3, 9, 12-13 and 15 had arthritis.

As can be seen from FIG. 3, a homogeneous response was observed for most patient sera. Overlapping fragments A and B and fragment D define regions of generally low reactivity. In contrast, seventeen of 18 patient's sera react strongly to the overlapping fragments E, F, and G. Fragments F and G are bound to approximately the same extent in all patients, and fragment H is much more weakly bound.

Sera from two healthy individuals (which also tested negative for B. burgdorferi infection in an ELISA) failed to react with any of the fragments. Moreover, we screened 10 additional control sera for 41 kDA and fragment E reactivity and all were negative (data not shown.).

Fragments E, F, and G define a region (amino acids 197-241) that is highly reactive with anti-B. burgdorferi antibodies in patient sera, but which does not share significant sequence homology to the flagellins of Escherichia coli, Salmonella typhimurium, Salmonella rubislaw, Roseburia cecicola or Serratia marcescens (except for four of seven identical amino acids within a short stretch defined by amino acids 209 to 215). Similarly, this region contains only a short segment of homology (four of 6 amino acids identical between amino acids 211-216) with the flagellin protein sequence of Treponema pallidum [C. I. Champion et al., "Cloning, Sequencing, And Expression Of Two Class B Endoflagellar Genes Of Treponema pallidum subsp. pallidum Encoding The 34.5 And 31.0-Kilodalton Proteins", Infect. Immun., 58, pp. 1697-1704 (1990)]. Accordingly, fragments E, F and G should not show substantial reactivity with antibodies directed against other bacteria or treponemes, and thus should represent immunodominant regions that are useful in the flagellin polypeptides of this invention.

To confirm these findings, we performed an immunoblot of fragments A-K using sera from 11 patients with Treponema pallidum, the agent of syphilis. The serum samples were obtained from the Connecticut State Laboratory. All the sera had VDRL titers ranging from 1:4 to 1:128 and all were positive by specific fluorescent antibody assay (FTA). We chose syphilitic sera because B. burgdorferi is closely related to Treponema pallidum and syphilis is the most common spirochetal infection of humans in the United States.

While 10 of the 11 sera bound fragment 41-B, which contains 65 NH.sub.2 -terminal amino acids of flagellin and thus represents a conservative figure for the level of binding one would expect to see for the full-length flagellin antigen, only two of the sera demonstrated detectable binding to fragment 41G, and that binding was very weak. After prolonged exposure, weak binding to the other fragments was detected.

We also tested the diagnostic effectiveness of the flagellin polypeptides of this invention by ELISA. We coated microtitration plates with 200 microliters per well of recombinant 41-G fusion protein (1 microgram/ml) suspended in 0.05M sodium carbonate, pH 9.6. We also used whole, sonicated B. burgdorferi strain 297 as a coating antigen as previously described [J. R. Craft et al., "Antibody Response In Lyme Disease: Evaluation Of Diagnostic Tests", J. Inf. Dis., 149, pp. 789-95 (1984)]. We incubated the plates at 4.degree. C. overnight, then washed with PBS containing 0.05% Tween-20 (PBST). The patient sera we used were diluted 1:100 in PBST and applied in triplicate to each antigen-coated plate at 200 micrograms per well. Plates were then incubated at room temperature for 75 minutes. We then washed the plates three times with PBST. For detection of bound antibody, goat anti-human mu chain alkaline phosphatase conjugate (Sigma) was diluted 1:1000 in PBST and applied at 200 microliters per well to the appropriate plates. We then incubated the plates at room temperature for 45 minutes. After three washes in PBST, p-nitrophenyl phosphate was added to each well. The production of p-nitrophenyl was monitored at 405 nm and the reaction stopped with 3M NaOH when the appropriate positive control wells reached an optical density (A405 value) of 1.0 to 1.5. We calculated the numerical values of the antibody response of patients' sera to each antigen by comparison to standard curves established on each antigen using known positive Lyme disease sera as previously described (J. R. Craft et al. supra).

Briefly, we established standard curves, using serial 2-fold dilutions of known IgM and IgG positive Lyme disease sera, for each antigen, with patients' sera applied to the same plates. In addition, eight known normal sera were run on the same plate, each at a 1:100 dilution; the mean A405 value of these eight sera was set as the cut-off A405 value. The first serial dilution of the standard positive sample that exceeded this cut-off value was assigned a value of 100 antibody units, and a curve relating A405 value to antibody units was established on this basis. The average A405 value for each patient serum was then compared to the standard curve and a value of antibody units was assigned to each serum on the basis of this comparison. A negative titer was <100 units, and titers of 200 to 400 represent reactivity compared to control, positive serum at subsequent 2-fold dilutions. We tested some of the serum samples a minimum of 2 times on separate occasions and in each instance there was never more than a 2-fold difference in the measured antibody levels.

Of the eleven syphilitic serum samples, three (having VDRL titers of 1:8, 1:32 and 1:128) showed weak reactivity with B. burgdorferi, yet none showed reactivity with the 41-G fragment.

Thus, a flagellin polypeptide comprising an immunodominant region corresponding to fragment 41G is highly specific and highly sensitive as well.

In other ELISAs to detect the presence of anti-B. burgdorferi antibodies, we found a high correlation in test results using whole spirochete extract or 41-G as the substrate. However, in a small number of patients, some discrepancies in results yielded by various substrates were noted. Over half of the "discrepant" results occurred with values just above the positive cut-off. Accordingly, as with any diagnostic assay, the sensitivity of diagnostic assays utilizing the flagellin polypeptides of this invention should be rigorously standardized…."

---

What that means is that there is no arguing the validity of my claim that Yale committed a crime. This is their own patent claim and validation.

You should be investigating and prosecuting this and not me. LymeRIX was scientific fraud. I have already given several of the State's Attorneys this data. I gave AAG Tom Ryan the Dearborn booklet and the old CDC published standard in the summer of 2003. I have been in communication with you before. I believe it was over my complaint against the State to the CT Commission on Human Rights in Waterbury.

**False Claims Act →** Allen Steere's 1993 blood testing standard for Lyme. All the US grants that were paid out upon that bogus standard, such as Klempner's chronic Lyme "study" were also false claims. The validity of the Yale Lyme vaccine qualification was a false claim, and they obviously knew it, since this is their earlier VALID diagnostic test.

http://whistleblowerlaws.com/protection.htm

I give the State the data, the State is not supposed to harass and abuse us, in response. The potential claims against Yale are huge. Yale cannot say the above is not a validation: It is Accurate, Specific, Early and tested empirically in the field.

KMDickson
http://actionlyme.org

CC: Gonzales, Chertoff, Goss, Mueller, Rendell, Sheller, Blumenthal, Milstein, McGuigan, Spitzer, Droney, Dorsey, Chatigny, Torres, Fitzgerald